# Illinois Official Reports

## Appellate Court

---

### *People v. Jones*, 2014 IL App (1st) 120927

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAYMOND JONES, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-12-0927 |
| Filed | March 24, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In defendant's appeal from his conviction for first degree murder for a gang-related shooting, defendant forfeited his objection to the trial court's brief questioning of two venirepersons *in camera* by failing to object, and regardless of the forfeiture, the procedure was too trivial to implicate the sixth amendment; additionally, the appellate court rejected defendant's contention that the opinion of the State's expert in forensic psychiatry that defendant could understand the *Miranda* warnings, despite his low IQ, was unreliable, and the trial court did not abuse its discretion in refusing to find defendant mentally impaired for purposes of sentencing or in imposing a 75-year sentence; however, the mittimus was corrected to reflect only one conviction for first degree murder, since only one person was killed. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-19003; the Hon. Domenica Stephenson and the Hon. Kenneth Wadas, Judges, presiding. |
| Judgment | Affirmed as modified. |

Counsel on Appeal

Michael J. Pelletier, Alan D. Goldberg, and James J. Morrissey, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Peter Maltese, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE DELORT delivered the judgment of the court, with opinion. Justices Hoffman and Cunningham concurred in the judgment and opinion.

## OPINION

¶ 1    Following a jury trial, defendant Raymond Jones was convicted of first degree murder (720 ILCS 5/9-1 (West 2010)) and sentenced to 75 years' imprisonment. On appeal, defendant contends that: (1) he was denied a public trial when the trial court held a portion of *voir dire in camera*; (2) the trial court erred in finding that defendant's inculpatory statements to the police were knowing and voluntary; (3) his sentence is excessive; and (4) one of his two convictions for first degree murder should be vacated. We affirm as modified.

¶ 2                                    I. BACKGROUND

¶ 3    Defendant Raymond Jones and codefendants Luis Pena, Antoine Lacy, and Joseph Chico were charged by indictment with, *inter alia*, first degree murder in connection with the shooting death of 10-year-old Nequiel Fowler.[1] Defendant and codefendants Pena and Lacy were tried simultaneously before three separate juries. Codefendant Chico agreed to plead guilty to conspiracy to commit murder with a 14-year sentence in exchange for his testimony against defendant and the other codefendants.

¶ 4                     A. Defendant's Motion to Suppress Statements

¶ 5    Before trial, defendant moved to suppress certain statements that he made to the police and an assistant State's Attorney. Defendant claimed that his inculpatory statements were involuntarily made because of his intelligence, his age, and his history of emotional and psychological problems. Defendant noted that his intelligence quotient (IQ) had recently been found to be 77 (placing him in the sixth percentile), that he was only 18, and that he suffered from severe depression since 2004 and a "severe emotional disturbance" since the second grade. Defendant concluded that, under the totality of the circumstances, his statements were involuntarily made and in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

_____

[1]The victim's first name is also spelled "Niquiel" and "Nequell."

¶ 6      At the hearing on his motion to suppress, Chicago police detective Michele Moore-Grose testified that, at around 4 p.m. on September 1, 2008, she and her partner, Detective Pat Ford, were assigned to investigate the shooting death of Fowler. Moore-Grose stated that they went to the scene and spoke to defendant, who claimed to have information regarding the shooting. According to Moore-Grose, defendant said that he saw the shooter and described the shooter as a black male, 20 to 30 years old, 5 feet 9 inches tall, weighing 200 pounds, and having braided hair. Moore-Grose, however, stated that they subsequently learned from codefendant Lacy that the shooter (Pena) and Chico were Hispanic, not black. Moore-Grose then called defendant and asked if they could again speak to defendant at defendant's home. Defendant agreed, and Moore-Grose met defendant outside the residence. Moore-Grose told defendant that they had received "conflicting information" regarding the shooter. According to Moore-Grose, defendant then began to cry, admitted lying to them, and also admitted that he hid the gun.

¶ 7      At that point, Moore-Grose placed defendant under arrest, put him in the back of her squad car, and advised defendant of his *Miranda* rights. Moore-Grose said that she read the rights to defendant from her "FOP book" and asked defendant whether he understood each individual right she had read to him. Defendant indicated he understood each of those rights, but he still wished to speak to them. Defendant, who was very upset and crying, said that he had hidden the gun on top of a kitchen cabinet in his apartment. The detectives received consent to search defendant's apartment and recovered the weapon. They then took defendant to the police station and placed him in an interview room that was video-recorded.

¶ 8      At around 2 a.m. on September 2, 2008, Moore-Grose and her partner again spoke with defendant. Moore-Grose said that they read defendant his *Miranda* rights. Defendant subsequently made various statements implicating himself in Fowler's murder. The video recording of this interview was played for the jury.

¶ 9      Dr. Fidel Echevarria, who was accepted by stipulation as an expert witness in the field of forensic psychiatry, testified that he was a staff psychiatrist for Cook County Forensic Clinical Services. Echevarria stated that he was asked to evaluate defendant specifically for his ability to understand his *Miranda* rights. Echevarria reviewed various records regarding defendant, including a previous psychological summary prepared by his colleague, Dr. Eric Neu. In addition, Echevarria met with defendant on March 4, 2011. Echevarria stated that he spent approximately three hours in preparing his report, which included about one hour for his in-person evaluation of defendant.

¶ 10     Echevarria recounted that Neu had administered a "Wechsler IQ test" that resulted in defendant obtaining a score of 77, which Echevarria said indicated a "borderline intellectual functioning range." Echevarria stated that Neu later opined following a subsequent evaluation that defendant was capable of understanding his *Miranda* rights.

¶ 11     With respect to his in-person evaluation of defendant, Echevarria testified that defendant understood the purpose of the evaluation and that the evaluation would not remain confidential. As to the *Miranda* rights, Echevarria said that defendant recounted that those rights included the right to remain silent, that anything defendant said could be used against him in court, and that he had the right to an attorney. Echevarria noted that, when he asked defendant the meaning of the term "right," defendant "thought several seconds and then responded, 'a choice.' " Defendant further explained that the right to remain silent meant that "you have to decide *** if you are going to talk or not to the police or to the State lawyer." Next, defendant told Echevarria that the warning that anything defendant said could be used

against him in court meant that, "if you make a decision to talk to the police or the State lawyer, that you are giving them evidence, basically you are helping them hang you." Defendant said that the right to an attorney meant that he could "ask the police to let [him] get a private lawyer," and that when he was at the police station, he could have asked for a public defender. Finally, Echevarria asked defendant regarding his right to have an attorney present during questioning. Defendant commented that "that's helpful, because a lawyer would be there to help you," and speculated that an attorney would recommend remaining silent and not speaking to the police other than to tell them that "you want to follow your *Miranda* rights."

¶ 12    After reviewing the video recordings of defendant's interviews that took place over a three-day period, Echevarria testified that there were "no specific or clear indications of any cognitive impairments or symptoms of any form of thought disorder." Echevarria thus opined that defendant was able to understand his *Miranda* rights at the time of his statement.

¶ 13    On cross-examination, Echevarria agreed that defendant had also been administered a "Stanford-Binet IQ test" in 2004, when defendant was 14, that resulted in a score of 76. Echevarria, however, denied that defendant's later score of 77 meant that defendant was mentally retarded because the classification of mental retardation has a "maximum" IQ of 75 and "indications of adaptive functioning problems." Echevarria, however, conceded that defendant's score of 77 could be as low as 73 due to the standard of error in administering the test, which would be within the mental retardation range. Echevarria also conceded that the score of 77 under the IQ test administered by Neu on November 30, 2010, comprised four subtests: verbal comprehension, working memory, perceptional reasoning, and processing speed, and that defendant's score on the verbal comprehension subtest was 68, placing him in the second percentile, the "extremely low" range. Echevarria, however, added that he had never seen any reports suggesting that someone with borderline intellectual functioning was more easily coerced or more easily suggestible than anyone else. Concerning the *Miranda* rights, Echevarria admitted that defendant said that he had been in jail "for almost two years and *** learned from reading over and over again in the law library what [those rights] mean." Finally, Echevarria agreed that the video recording indicated that defendant was not given a definition of the words "waiver" and "counsel," but Echevarria stated that defendant provided an "unusually good response," when defendant was asked about his *Miranda* rights. At the conclusion of Echevarria's testimony, the parties rested. Following arguments of counsel, the trial court denied defendant's motion, and the cause eventually proceeded to *voir dire*.

¶ 14                                B. Voir Dire

¶ 15    Jury selection began on January 9, 2012. During *voir dire*, the judge[2] asked whether any potential juror had a conflict that would prevent him or her from serving. Potential juror Linda Pader said that she had a "personal" matter and would rather explain it "one on one." The judge responded that she could discuss the matter in chambers during a break.

¶ 16    The judge then asked whether any of the venirepersons (or any friend or family member) had been the victim of a crime. Potential juror Paul Cook responded that one of his best friends

---

[2]As noted above, defendant and his codefendants were tried simultaneously before three separate juries. For clarity, we refer to Judge Stephenson, who conducted the *voir dire* for this defendant's jury, as the "judge," and to Judge Wadas, who presided over the rest of defendant's trial and sentencing, as the "trial court."

in high school had been killed in 1969, and someone had been charged. When asked if he could put aside what had happened to his friend and decide this case solely on what he saw and heard in the courtroom, Cook replied, "I guess it would be the circumstance in which the gentleman was killed." The judge then questioned another potential juror as to this issue.

¶ 17    Later, the judge asked the individual venirepersons whether they would be able to sign a guilty verdict if the State were able to prove beyond a reasonable doubt the charges alleged against defendant. Potential juror Enrique Medrano replied, "I do not understand," and on further questioning as to his understanding of the judge's previous questions, Medrano responded, "Little bit, not much," informing the judge that his first language was Spanish. The judge then proceeded to ask the individual venirepersons whether they could sign a not guilty verdict if they believed the State had not proved beyond a reasonable doubt that defendant committed the alleged offenses. Turning to Medrano, the judge saw Medrano nodding his head and asked if Medrano understood that question. Medrano answered, "A little bit."

¶ 18    Next, the judge questioned the venire regarding matters on their individual juror cards. The judge, however, did not ask Medrano regarding his ability to understand English, nor did she question Cook's ability to be impartial. The judge then took a brief recess.

¶ 19    In chambers, the judge and the parties spoke to Pader, who explained that she was breastfeeding her two-month-old twins, but agreed that she could nonetheless serve if she could be accommodated with more frequent breaks. The State, however, exercised a peremptory challenge against Pader, and she was excused from further service.

¶ 20    The discussion then turned to challenges for cause. With respect to Medrano, the State said that it would not object to striking Medrano for cause. While the State expressed its disbelief that Medrano had any difficulty understanding English, defense counsel disagreed with the State, believing that Medrano only understood simple questions. Without objection, the judge had Medrano brought back to chambers.

¶ 21    While waiting for Medrano, the parties discussed Cook's response. The State noted that Cook had stated that, due to his friend being killed, the circumstances of the case might affect his ability to be fair, and added, "to be safe, he should probably be knocked off." Defense counsel, however, believed that Cook had said that "it would depend on the circumstances of whether he could be fair." Again without objection, the judge asked that Cook be brought back to chambers for further questioning.

¶ 22    Medrano then arrived, and the judge again asked whether Medrano could sign a guilty verdict form if the State had proved its case beyond a reasonable doubt, but Medrano replied that he was nervous about providing the "wrong" answer and that he understood English only a little. Medrano explained that his son helped him fill out his juror information card. Medrano further stated that he could understand questions about where he lives or works, but he would become nervous and not remember if they were more complicated. Medrano returned to the courtroom, and the judge excused Medrano for cause. Defense counsel agreed.

¶ 23    Cook arrived, and the judge asked him to clarify his prior statement that, due to his friend's killing in 1969, his ability to be fair and impartial would depend upon the circumstances of the case. Cook elaborated that an individual who lived across the street from him while Cook was a junior in high school had been shot and killed because the individual (a "bouncer" at a bar) would not allow the shooter or the shooter's three friends to enter the bar. Cook described it as a "senseless killing," and further stated, "[A]nybody that could do that I have no pity for whatsoever." In response to the judge's question, Cook clarified that, if this case involved

someone who "comes up and shoots somebody, whether there is four people in one part against the other guy, and for no reason shoots him, I think all four are guilty." As with Medrano, neither the State nor defendant had any questions, and Cook then returned to the courtroom. By agreement with the parties, the judge excused Cook for cause.

¶ 24                                            C. Trial

¶ 25        The following evidence was adduced at trial. Chico testified that he, Pena, and Lacy were members of the "Latin Dragons" gang. Although Chico denied that defendant was also a member, he admitted that defendant often associated with Latin Dragons gang members. Lacy was "first in command," whereas Pena was merely a "soldier" or "shooter." According to Chico, the Latin Dragons controlled the general area of East 87th Street and South Escanaba Avenue in Chicago, but a rival gang, the "Latin Kings," controlled the area near East 87th and South Exchange Avenue, one block east of Escanaba. Chico added the Latin Dragons would kill any member of the Latin Kings "on sight."

¶ 26        On Monday, September 1, 2008, Chico said that there was a "mandatory Monday" assembly for which the Latin Dragons had to converge in the Escanaba area in a show of strength. As Chico drove to the area with Lacy and Pena, Chico heard Lacy call another gang member to ask who had the gang's gun for that area. After the call, Lacy said that "Raymond" had the gun.

¶ 27        Chico then saw Lacy and Pena in front of defendant's house, which was located in the area of 87th and Escanaba. Lacy left with another individual, and Chico later learned that Lacy had gone to 87th and Exchange and had seen some members of the Latin Kings there. Lacy told Chico he had "some Niggers in the[ ] dip," which Chico interpreted to mean that Lacy had arranged for some armed individuals to be in the gangway near 87th and Exchange. Chico knew the individuals were Pena and defendant. Chico and Lacy then walked to defendant's backyard and met with defendant and Pena, and Lacy told Pena to go "fire the Kings up." Defendant went into his house to change his clothes, and Chico and Lacy left when defendant came back outside. Defendant and Pena remained in defendant's backyard.

¶ 28        As Chico and Lacy were leaving the gangway, Chico heard about five gunshots coming from the alley between Exchange and Escanaba behind defendant's home. Chico said he ducked down and started walking to his car with Lacy. They got into Chico's car, and Chico started to leave, but Lacy told Chico to wait for Pena when Chico turned the corner at 87th and South Muskegon Avenue. Pena got into Chico's car, and the group drove to Lacy's home. Chico noted that Pena was wearing a white T-shirt instead of the blue shirt he had on earlier. While en route, Chico learned that someone had been injured. After dropping Lacy off, Chico left Lacy's home with Pena. Pena said that he "fucked up" and that he had a "bad feeling." Chico admitted that he was subsequently charged with the first degree murder of the victim, but that he entered into a plea agreement in which he agreed to testify against his codefendants and plead guilty to conspiracy to commit first degree murder in exchange for a 14-year prison sentence.

¶ 29        Defendant's father, Joseph Slomka, testified that, at the time of the shooting, he was sitting on the front porch of his house and heard gunshots coming from the alley behind his house. Slomka looked down the gangway and saw Pena walking from the alley to the backyard of Slomka's house. Pena then walked up to defendant and "shoved" what appeared to be a blue rag into defendant's chest. Although Slomka added that Pena threatened defendant if

defendant refused it, Slomka conceded that the transcript of his grand jury testimony indicated that Pena only said, "I'll see you later."

¶ 30    Moore-Grose testified substantially the same as during the hearing on defendant's motion to suppress. Moore-Grose stated that she and her partner, Detective Ford, were assigned to investigate the shooting death of Nequiel Fowler at around 4:40 p.m. on September 1, 2008. They arrived at the scene, and a sergeant brought defendant over to them. Defendant told Moore-Grose and Ford that the shooter was a black male with braids who was 5 feet 9 inches tall and weighed 200 pounds. After speaking with Lacy, however, she confronted defendant and told him she had received conflicting information. Defendant then broke down, began crying, and said that he had the gun that was used in the shooting. Defendant was arrested and read his *Miranda* rights, and after waiving his rights, he told the officers where to find the gun. Defendant's mother consented to a search of her house, and the gun was found along with a blue shirt. Defendant's fingerprints, but not Pena's or Lacy's, were found on the gun. A test of the blue shirt revealed a DNA profile that was consistent with Pena's.

¶ 31    The jury found defendant guilty of first degree murder and also found that a firearm was used during the commission of the offense.[3] Defendant filed a motion for a new trial that he later amended. In the amended motion, defendant argued, *inter alia*, that the trial court erred in denying both his motion to suppress and also his request to introduce evidence concerning the voluntariness of his statement to police, such as the entire video recording. The trial court denied the motion, and the cause proceeded to sentencing.

¶ 32                    D. Sentencing and Other Posttrial Matters

¶ 33    Following arguments in mitigation and aggravation, the trial court considered the factors in mitigation. The trial court found "virtually" no applicable mitigating factor except that defendant's conduct was facilitated by someone other than the defendant, but only "[i]n a very small limited sense." The trial court further stated, "I guess you could say that Lacy was the guy that was shouting commands and getting everything in motion out there to some extent. [Defendant] was a want-a-be [*sic*] gangbanger who was acting as the custodian of the weapon." The trial court also noted that defense counsel had raised "throughout the trial, and made reference to it in her mitigation argument about [defendant's] lack of mental capacity." The trial court, however, rejected that argument, stating that defendant's actions–hiding the murder weapon in his house, pretending to be a witness, and deflecting attention from "the real killers"–were "as bold as it gets." The trial court also stated that defendant was not "borderline"; rather, the trial court found defendant to be "slick enough to obstruct justice," which the trial court characterized as "pretty cold-blooded," and "significant aggravation." The trial court added that defendant was not "mentally retarded [*sic*] as defined by [s]ection 5-1-13 of the [Unified Code of Corrections]."

¶ 34    With respect to factors in aggravation, the trial court found that defendant's conduct caused or threatened serious harm, but that factor was inherent in the offense. Additionally, the trial court stated that defendant had a history of prior delinquency and that the sentence was necessary to deter others, "especially other gang bangers [*sic*] out in his neighborhood." Finally, the trial court observed that defendant was convicted of a felony while he was released

---

[3]The record indicates that Lacy's and Pena's respective juries did not find that either of them used a firearm during the commission of the offense.

on bail and while on probation. Finding "many factors in aggravation that cry out for the maximum sentence," and after ordering the conviction under count II merged into count I, the trial court sentenced defendant to 60 years' imprisonment plus a 15-year enhancement due to the jury's special verdict that defendant committed the offense while armed with a firearm. Defendant filed a motion to reconsider his sentence, which the trial court denied.

¶ 35    This appeal follows.

¶ 36                                 II. ANALYSIS
¶ 37                        A. Defendant's Right to a Public Trial
¶ 38    Defendant first contends that he was denied his constitutional right to a public trial when the judge held a portion of *voir dire in camera*. Defendant complains that the judge erred when she (1) failed to make any findings that would justify conducting part of *voir dire* in chambers, (2) failed to consider alternatives to "closing the trial proceedings," and (3) conducted the *in camera voir dire* when neither potential juror (Cook or Medrano) asked to respond privately to the questions. Defendant asserts that these errors were "a total closure of the trial proceedings" and that we must therefore remand for a new trial. In reply to the State's argument that defendant has procedurally defaulted this issue, defendant contends that the United States Supreme Court in *Presley v. Georgia*, 558 U.S. 209, 213 (2010), obviated the need for a defendant to object to a courtroom closure during trial, including *voir dire*. We disagree.

¶ 39    While it is true that the Court in *Presley* held that a trial court must consider alternatives to closure "even when they are not offered by the parties" and stated that the public has a right to be present at a trial whether or not any party has asserted the right (*Presley*, 558 U.S. at 214 (citing *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 503-05 (1984))), defendant misreads *Presley* in arguing that these statements eliminated the necessity of lodging an objection. In both *Presley* and *Press-Enterprise*, there were objections before the trial court. See *Presley*, 558 U.S. at 210; *Press-Enterprise*, 464 U.S. at 503-04. Thus, while trial courts are required to consider alternatives to closure even when no party offers any, the trial court must nonetheless have an objection before it. Here, the judge, while in chambers with the State and defense counsel, indicated that she intended to bring back Medrano and Cook for further questioning, but defense counsel made no objection. Thus, since there was no objection before the judge when she conducted the *in camera* proceedings, this issue is forfeited on appeal. Accord *Downs v. Lape*, 657 F.3d 97, 108 (2d Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 2439 (2012); *United States v. Bansal*, 663 F.3d 634, 660-61 (3d Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 2700 (2012); *People v. Alvarez*, 20 N.Y.3d 75 (N.Y. 2012), *cert. denied*, ___ U.S. ___, 133 S. Ct. 1736 (2013).

¶ 40    Nonetheless, defendant asks that we review this issue for plain error. The plain error doctrine allows a reviewing court to bypass normal forfeiture principles and consider an otherwise unpreserved error affecting substantial rights when either: "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 187 (2005); see also Ill. S. Ct. R. 615(a). Under the second prong of the plain error doctrine, which defendant claims is applicable, a defendant must show that the error was so serious that it affected the fairness of his trial and challenged the integrity of the judicial process. *Herron*, 215 Ill. 2d at 187. We find defendant's claim to be unavailing.

¶ 41     The sixth amendment to the United States Constitution, applicable to the states through the fourteenth, guarantees to an accused the right to a public trial. U.S. Const., amends. VI, XIV; *Gannett Co. v. DePasquale*, 443 U.S. 368, 379-80 (1979); see also Ill. Const. 1970, art. I, § 8 ("In criminal prosecutions, the accused shall have the right to *** a speedy public trial ***."). This right is for the protection of the accused and is designed to: (1) ensure a fair trial; (2) encourage the prosecution and the trial court to carry out their duties responsibly; (3) encourage witnesses to come forward; and (4) discourage perjury. *Waller v. Georgia*, 467 U.S. 39, 46 (1984). This right also extends to *voir dire*. *Presley*, 558 U.S. at 213.

¶ 42     The right to a public trial, however, is not absolute. A trial can be closed if exigent circumstances require it. *Peterson v. Williams*, 85 F.3d 39, 42 (2d Cir. 1996), *cert. denied*, 519 U.S. 878 (1996). In addition, a temporary closure may, under certain circumstances, not violate the sixth amendment because it was "too trivial" to amount to a violation. *Id.* at 42-43. This "triviality standard," however, is not a harmless error analysis; instead, this standard examines the trial court's acts and the effects upon the trial to determine whether a defendant was denied the sixth amendment protections enumerated in *Waller*. *Id.* With respect to *voir dire*, it is well established that Supreme Court Rules 431 and 234 (Ill. S. Ct. R. 431 (eff. July 1, 2012); R. 234 (eff. May 1, 1997)) grant a trial court the discretion to conduct *voir dire* outside the presence of the other venirepersons. *People v. Williams*, 147 Ill. 2d 173, 214-15 (1991) (citing *People v. Neal*, 111 Ill. 2d 180, 198 (1985)).

¶ 43     *Braun v. Powell*, 227 F.3d 908 (7th Cir. 2000), provides guidance on this issue. There, the petitioner argued that her right to a public trial was violated by the state trial judge's exclusion of a potential juror, Mane, from the courtroom after he was not chosen to sit as a juror. *Id.* at 917. Mane wanted to stay in the courtroom to view the proceedings, but the trial judge refused to allow him to remain because of the judge's policy of not permitting persons who had served on the venire to remain in the courtroom. *Id.* Although it noted that the exclusion was permanent as to Mane and intentional on the part of the trial judge, the *Braun* court also observed that the exclusion applied only to one person who was neither a relative nor a friend of the defendant. *Id.* at 919. The court held that none of the values discussed in *Waller* were implicated in any substantial way by the exclusion of Mane. *Id.* Specifically, the court held that the petitioner's trial was no less fair, nor did "the court officers or witnesses [take] their roles any less seriously" due to the exclusion of Mane. *Id.* The court further held that, despite no justification in the record for the trial judge's action, no meaningful detriment to the integrity of the trial proceedings occurred. *Id.* Finally, the Braun court held that the excluded jury pool member had no effect on either encouraging witnesses to come forward or discouraging perjury. *Id.* The court thus rejected the petitioner's claim. *Id.* at 920.

¶ 44     Here, as in *Bansal*, neither defendant, the news media, nor the public requested access to the brief questioning of Cook and Medrano.[4] Thus, at most, the judge here, as in *Bansal*, "prevented the members of the *voir dire* panel from hearing other members' responses," which does not violate the right to a public trial. See *Bansal*, 663 F.3d at 661 ("[W]e are aware of no case holding that such procedures offend the Sixth Amendment."); see also *United States v. Ivester*, 316 F.3d 955, 959 (9th Cir. 2003) ("Because a trial judge may question a juror alone in

---

[4]We set aside whether defendant would have standing to raise this claim on behalf of the news media or the public in general. See *Bansal*, 663 F.3d at 661.

chambers, without the public present, *a fortiori* the judge may do so with the parties and counsel present.").

¶ 45    Moreover, as in *Braun*, the values underlying the sixth amendment right to public trial that were expressed in *Waller* were not significantly undermined. We note that one potential juror, Pader, requested an *in camera* discussion, whereas the two potential jurors at issue here, Medrano and Cook, made no such request. Nonetheless, we find nothing in the record–and defendant points to nothing–that would indicate that defendant's trial was any less fair, or that the court officers or witnesses took their roles any less seriously, following the judge's brief *in camera* questioning of Medrano and Cook, which both parties agreed to. In addition, we can discern no meaningful detriment to the integrity of the trial proceedings, given that the judge's questioning in chambers resulted in Medrano's and Cook's being excused from the jury for cause, again which both parties agreed to. Finally, there was no adverse effect either on encouraging witnesses to come forward or on discouraging perjury. Therefore, the trial court did not abuse its discretion in briefly questioning Medrano and Cook outside the presence of the remaining venirepersons, and in any event, the closure here was too trivial to implicate the sixth amendment. Defendant's claim is therefore without merit.

¶ 46                        B. Defendant's Inculpatory Statements to the Police

¶ 47    Defendant next claims that the trial court erred in finding that defendant's inculpatory statements to the police were knowing and voluntary. Specifically, defendant argues that the trial court erred in finding that defendant waived his *Miranda* rights due to his low IQ, age, and history of educational and emotional difficulties. Defendant further challenges the expert opinion of Echevarria, characterizing it as unreliable because Echevarria's interview took place more than two years after defendant's interrogation.

¶ 48    It is well established that admitting an involuntary confession into evidence violates both the federal and state constitutions. *People v. Nicholas*, 218 Ill. 2d 104, 118 (2005) (citing U.S. Const., amend. V, and Ill. Const. 1970, art. I, § 10). Moreover, it is the State's burden to prove by a preponderance of the evidence that a defendant's confession was given voluntarily. *People v. Redd*, 135 Ill. 2d 252, 292 (1990). The voluntariness of a confession depends upon the totality of the circumstances surrounding it, including the presence of *Miranda* warnings, and the defendant's age, intelligence, education, and experience at the time of the detention and interrogation. *People v. Willis*, 215 Ill. 2d 517, 536 (2005). No single factor is controlling. *People v. Daniel*, 238 Ill. App. 3d 19, 30-31 (1992).

¶ 49    With respect to the presence of *Miranda* warnings, a valid waiver of *Miranda* rights must be knowingly and intelligently made. *People v. Bernasco*, 138 Ill. 2d 349, 364-65 (1990). Evidence of a defendant's limited mental or intellectual capacity at the time of a confession, alone, does not establish that he or she was incapable of waiving *Miranda* rights; rather, it is only one of several factors to be considered in this regard. *People v. Braggs*, 209 Ill. 2d 492, 514-15 (2003). Those factors include the background, experience, and conduct of the accused. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). The defendant need not understand far-reaching legal and strategic effects of waiving his or her rights or appreciate how widely or deeply an interrogation may probe; instead, the defendant must, at a minimum, "understand basically what those rights encompass and minimally what their waiver will entail." *Bernasco*, 138 Ill. 2d at 363.

¶ 50    In reviewing whether a defendant's confession was voluntary, we must uphold factual findings unless they are against the manifest weight of the evidence, but review *de novo* the ultimate question of whether the confession was voluntary. *In re G.O.*, 191 Ill. 2d 37, 50 (2000). Factual findings are deemed to be against the manifest weight of the evidence "only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002).

¶ 51    In this case, Dr. Echevarria, accepted by stipulation as an expert in forensic psychiatry, testified that he reviewed various records regarding defendant, including a previous psychological summary prepared by his colleague, Dr. Eric Neu, and met with defendant for about one hour on March 4, 2011. Echevarria stated that, although defendant's IQ was 77, indicating a "borderline intellectual functioning range," Echevarria agreed with Neu's opinion that defendant understood his *Miranda* rights. Echevarria stated that, during his meeting with defendant, defendant was able to recite and explain each of his *Miranda* rights, and that defendant described a "right" as "choice," an "unusually good response," according to Echevarria. He also added that, although defendant had claimed to have been reading about those rights in the prison law library during the 2½-year period between his arrest and his evaluation, Echevarria also reviewed the lengthy video recordings of defendant's police interrogations, which did not indicate that defendant had any difficulty understanding his *Miranda* rights. In addition, the record indicates that defendant has had prior experience in the criminal justice system, including a conviction for burglary for which he had been on probation at the time of the offense in this case. Finally, although Echevarria agreed that defendant's IQ was low, Echevarria had never seen anything to suggest that someone with borderline intellectual functioning is more easily coerced or more easily suggestible than anyone else. On these facts, the trial court found that defendant understood his *Miranda* warnings. Based upon our review of the record, neither the opposite conclusion to the trial court's factual findings is apparent, nor were the trial court's findings unreasonable, arbitrary, or not based on the evidence. Consequently, the trial court's factual findings were not against the manifest weight of the evidence. *Eychaner*, 202 Ill. 2d at 252.

¶ 52    Finally, our decision as to this issue is unaffected by defendant's reliance on *People v. Turner*, 56 Ill. 2d 201 (1973). In *Turner*, the 24-year-old defendant–who had been convicted of murder and rape–had an IQ of 77 at age eight and an IQ of 75 three years later. *Id.* at 203. The supreme court, however, noted that a polygraph examiner administering a test on the defendant knew that the defendant "was of low mentality, yet so far as the record indicates he did not advise the police officers of his request for an attorney. It was not until 5 hours later that defendant confessed to the polygraph examiner and an additional 7 hours elapsed before the statements were revised to the satisfaction of the police, and signed by the defendant." *Id.* at 207. The defendant was granted a new trial. *Id.* at 207-08. Here, by contrast, there is no indication in the record that defendant had ever indicated that he wished to speak to an attorney. Moreover, we note the *Turner* court's comments that, whether there has been an intelligent waiver of *Miranda* rights depends upon the particular facts and circumstances of each case, "including the background, experience, and conduct of the accused," and that "mental deficiency, of itself, does not render a confession involuntary": it is simply a factor which must be considered in the totality of the circumstances under which the confession was made. (Internal quotation marks omitted.) *Id.* at 205-06. Under the facts and circumstances of this case, including defendant's background and experience as well as his intellectual and

emotional challenges, the trial court did not err in finding defendant's statements to be knowing and voluntary. *Turner* is thus unavailing, and defendant's claim is without merit.

¶ 53                                C. Defendant's Sentence

¶ 54        Defendant next contends that his 75-year sentence is excessive. Specifically, defendant argues that the trial court failed to adequately consider his intellectual disability, his young age, his lack of a violent criminal record, his social environment, and the fact that his conduct was compelled by members of the gang that controlled the block where he lived. Defendant asks that we either reduce his sentence or remand the matter for a new sentencing hearing.

¶ 55        In imposing a sentence, the trial court must balance relevant factors, such as the nature of the offense, the protection of the public, and the defendant's rehabilitative potential. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). The trial court has a superior opportunity to evaluate and weigh a defendant's credibility, demeanor, character, mental capacity, social environment, and habits. *Id.* In addition, a trial court is not required to expressly outline its reasoning for sentencing, and absent some affirmative indication to the contrary (other than the sentence itself), we must presume that the court considered all mitigating factors on the record. *People v. Perkins*, 408 Ill. App. 3d 752, 762-63 (2011). Since the most important sentencing factor is the seriousness of the offense, the court is not required to give greater weight to mitigating factors than to the seriousness of the offense, and the presence of mitigating factors neither requires a minimum sentence nor precludes a maximum sentence. *Alexander*, 239 Ill. 2d at 214.

¶ 56        A sentence within statutory limits is reviewed for an abuse of discretion, and we may only alter such a sentence when it varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Id.* at 212. So long as the trial court does not ignore pertinent mitigating factors or consider either incompetent evidence or improper aggravating factors, it has wide latitude in sentencing a defendant to any term within the applicable statutory range. *Perkins*, 408 Ill. App. 3d at 762-63. This broad latitude means that this court cannot substitute its judgment simply because it might have weighed the sentencing factors differently. *Alexander*, 239 Ill. 2d at 212-13.

¶ 57        In this case, the trial court did not abuse its discretion. The sentencing range for first degree murder while armed with a firearm is from 35 to 75 years' imprisonment. See 730 ILCS 5/5-4.5-20(a)(1) (West 2008) (20- to 60-year sentencing range for first degree murder); 730 ILCS 5/5-8-1(d)(i) (West 2008) (15-year add-on if a firearm is used). Since defendant's sentence falls within the sentencing range, we may only disturb the sentence if it varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Alexander*, 239 Ill. 2d at 212. Neither exception applies in this case.

¶ 58        Here, the trial court meticulously went through the statutory factors in mitigation, finding that none applied except for the factor that defendant's conduct had been facilitated by another (here, Lacy). Defendant, however, was convicted of providing the weapon used in the concededly accidental shooting death of a 10-year-old girl, hiding that weapon after the murder, and then misdirecting police investigators. Furthermore, at the time of the offense, defendant had been on probation for burglary, a minimum Class 2 felony (see 720 ILCS 5/19-1(b) (West 2008)), and the burglary conviction occurred just over a year prior to this offense. Finally, defendant had a prior juvenile adjudication for criminal damage to property.

¶ 59        In addition, the trial court did not abuse its discretion in refusing to find defendant mentally impaired, as defined in section 5-5-3.1 of the Unified Code of Corrections (730 ILCS 5/5-5-3.1 (West 2008)). The evidence before the trial court was that defendant's IQ was consistently above 75, the cut-off for mental retardation (in addition to adaptive functioning problems). The trial court was able to observe defendant throughout the trial proceedings and the testimony of Echevarria established that defendant did not meet the standards for mental retardation. The trial court therefore did not abuse its discretion. See *People v. Young*, 250 Ill. App. 3d 55, 59 (1993) (affirming trial court's finding that the defendant was not mentally impaired despite an IQ of 76 and " 'significant psychological and emotional problems' ").

¶ 60        Nonetheless, we recognize that defendant's misdirection of the police appeared to be somewhat brief (there was no evidence in the record to the contrary), and when confronted with the discrepancy in his information compared to the information Lacy gave to investigators, defendant immediately broke down and not only told the officers that he had misdirected them, he also told them precisely where he had hidden the gun that was used in the shooting. We are prohibited, however, from substituting our judgment for that of the trial court simply because we might have weighed the sentencing factors differently. *Alexander*, 239 Ill. 2d at 212-13. Defendant's 60-year sentence, which excludes the statutorily mandated 15-year add-on, was the same sentence as Lacy, the purported "mastermind" of this senseless killing, and Pena, the alleged shooter. Since defendant's sentence falls within the sentencing range, albeit at the maximum level, we cannot say that it varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Id.* at 212. We must therefore hold that the trial court did not abuse its discretion in imposing this sentence.

¶ 61                                          D. Defendant's Mittimus

¶ 62        Finally, defendant contends that his mittimus incorrectly reflects two convictions for first degree murder, and as such, we should vacate one of those convictions. The State agrees. For the following reasons, we vacate one of defendant's first degree murder convictions.

¶ 63        In this case, the report of proceedings indicates that the trial court ordered count II to merge into count I, but the common law record, which contains defendant's mittimus, indicates two convictions for first degree murder (counts I and II). Where there is a conflict between the common law record and the report of proceedings, the report of proceedings controls. *People v. Stingley*, 277 Ill. App. 3d 239, 242 (1995). In addition, it is well established that, "[w]here but one person has been murdered, there can be but one conviction of murder." *People v. Kuntu*, 196 Ill. 2d 105, 130 (2001). Finally, this court has the authority to order the mittimus to be corrected without remandment. See *People v. Mitchell*, 234 Ill. App. 3d 912, 921 (1992); Ill. S. Ct. R. 615(b)(1). Accordingly, we direct the circuit clerk to correct the mittimus to reflect one first degree murder conviction under count I.

¶ 64                                          III. CONCLUSION

¶ 65        Defendant was not denied a public trial when the trial court held a portion of *voir dire in camera*: defendant's claim is forfeited, and his claim fails on the merits. In addition, the trial court's finding that defendant's inculpatory statements to the police were knowing and voluntary was not against the manifest weight of the evidence, where defendant executed a valid waiver of his *Miranda* rights. Third, we reject defendant's contention that his sentence is

excessive. Finally, defendant's mittimus should be corrected to reflect one conviction for first degree murder, rather than two. Accordingly, we affirm as modified the judgment of the trial court.

¶ 66        Affirmed as modified.