2021 IL App (2d) 191073-U
No. 2-19-1073
Order filed November 8, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-139 |
| LARRY R. LOTZ, | ) ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices McLaren and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*: We affirm defendant's 16-year sentence for second degree murder over his contention that the sentence was excessive.

¶ 2   After a bench trial, the trial court found defendant, Larry R. Lotz, guilty of second degree murder (720 ILCS 5/9-2(a)(2) (West 2016)) and sentenced him to 16 years' imprisonment. Defendant appeals, contending the trial court abused its discretion in imposing the 16-year sentence, which he argues was excessive under the circumstances of this case. We affirm.

¶ 3                         I. BACKGROUND

¶ 4                         A. The Charges

¶ 5    Around 12:40 a.m. on January 15, 2016, defendant shot and killed his wife of 40 years, Karen Lotz, with a single-action .45-caliber revolver. Three of the four bullets defendant shot toward Karen struck her head, chest, and shoulder. (Karen also had a graze wound on her left forearm.) A fifth live bullet was found at the scene. The live bullet was determined to have an impression of the revolver's firing pin on it. As discussed below, the evidence at trial suggested defendant unsuccessfully attempted to shoot himself before turning the gun on Karen. A grand jury indicted defendant on three counts of first degree murder under various theories (*id.* § 9-1(a)(1), (2), (3) (West 2016)). The indictment alleged defendant personally discharged the firearm that caused Karen's death, thus subjecting defendant, if convicted, to a prison term of 45 years to natural life. See 730 ILCS 5/5-4.5-20(a), 5-8-1(a)(1)(d)(iii) (West 2016).

¶ 6                                    B. Trial

¶ 7    Before trial, defendant informed the trial court and the State that he intended to rely, in part, on the affirmative defense of insanity. See 720 ILCS 5/6-2 (West 2016). Defendant elected a bench trial, at which the evidence established as follows.

¶ 8    Defendant and Karen lived on Cook Street in Barrington. At some point, defendant constructed a garage on the property, complete with a second-floor loft, which defendant called his "man cave" and where he would spend a lot of time. Karen rarely went up into the man cave.

¶ 9    By all accounts, defendant and Karen had a loving and mutually respectful and devoted marriage. Defendant and Karen argued as any married couple does. When they did, defendant would often retreat to his man cave, where he could be alone before emerging to resolve the argument by discussing it in a rational manner. There was no evidence to suggest either defendant or Karen physically abused the other during their marriage. In fact, the evidence showed they

formed a mutual understanding at the beginning of their marriage that neither would ever physically harm the other.

¶ 10    Defendant served in the United States Army and saw combat during the Vietnam War. His division was frequently attacked, at all times of day. Defendant presented evidence of a particular incident, in which a young soldier tripped a booby trap that had been placed near defendant's living quarters, causing a grenade to detonate approximately five feet from defendant, who was sleeping. The grenade caused defendant to suffer a traumatic brain injury (TBI) and knocked him unconscious.

¶ 11    In June 2014, defendant spent five or six days with Herman Arellano, with whom he served in Vietnam and who was present when the booby trap went off. At the time, Arellano had spent six years in therapy to treat post-traumatic stress disorder (PTSD), and he noticed defendant was exhibiting many of the symptoms he had been suffering before beginning therapy, including impatience, frustration, hypervigilance, depression, and inability to sleep. He also noticed that defendant startled easily. At trial, defendant's sons, his friends and neighbors, and Karen's sister confirmed defendant startled easily and that they knew not to surprise him.

¶ 12    Defendant's sons, Curtis and Matthew Lotz, testified that defendant's cognitive functioning had deteriorated in the two or three years leading up to the shooting. They explained defendant had an "amazing memory," was "very, very sharp," was proficient in computers, and was a talented designer and builder, but his skills began to deteriorate, and he would often become confused and have difficulty understanding things he used to know. Curtis and Matthew also observed that defendant had become increasingly concerned about the safety of the neighborhood and the need to protect the house. Defendant kept a machete next to the door in the garage and was

concerned someone would "charge up the stairs and attack him." He also kept several guns, was proficient in the use of them, and often took Curtis and Matthew to the shooting range.

¶ 13 On January 14, 2016, defendant spoke with Karen's sister, Mary Ann Kobinski, and his son, Matthew. During those conversations, defendant seemed "fine." He told Matthew he was excited to cook dinner for Karen later that night.

¶ 14 Around 7:30 p.m., Karen returned to the couple's home after having worked late at her job at Harper College. When she arrived home, defendant was in his man cave, and at some point, he went inside, spoke with Karen, and then went upstairs to watch television.

¶ 15 Later, Karen went upstairs and began "nagging" defendant about a coffee pot he had left on. Defendant told her he had turned off the coffee pot, to which Karen replied, "Maybe you left it on. You've been forgetting things." Karen continued "harping" on defendant, and defendant went downstairs and grabbed the coffee pot, intending to take it to the man cave so Karen would no longer worry about it. Karen followed defendant downstairs and began grabbing and pulling on him. Defendant told Karen to leave him alone and left the house to go to the garage, closing the door behind him. Karen followed defendant outside and grabbed him, and, in response, defendant pushed Karen away and threw the coffee pot to the ground. Defendant went inside the garage, locked the door behind him, walked up to the man cave, and sat at his desk.

¶ 16 Karen unlocked the garage, went inside, and "start[ed] all over again," yelling at defendant. She had not been up to the man cave more than four times in the previous three years. Defendant screamed at Karen to "leave [him] alone" or "go away." Without "even thinking about it," he grabbed the .45-caliber revolver, which was loaded with five rounds, that he kept in his desk. Defendant thought, "I'll just kill myself," pointed the gun at his head, cocked it, but "nothing

happened." Karen "came flying up" the stairs. Defendant saw her come to the doorway, yelled to her, "I thought I told you to leave me alone" or "shut up," and then "just started shooting."

¶ 17    Around 12:40 a.m., defendant called 911 to report the shooting. A recording and transcript of the call were admitted into evidence at trial. The call lasted less than two minutes before being disconnected. Defendant was extremely distressed, and the operator had difficulty understanding him because he was screaming. As soon as the operator answered the phone and asked where the emergency was, defendant screamed, "I just shot my wife!" Defendant told the operator his address, that they were in the garage, and implored her to send an ambulance.

¶ 18    After the call was disconnected, defendant called Curtis and said, "you better get down here. I just shot your mom." At trial, Curtis described the call as "entirely unintelligible." Curtis told defendant to call back 911. Defendant tried to do so but was interrupted by a phone call from the 911 operator, which defendant answered after two rings. A recording and transcript of the second call were also admitted into evidence at trial.

¶ 19    During the second call, defendant was still extremely agitated. He told the operator Karen was still breathing, he did not know where he hit her, and he had since unloaded the gun. He also stated, "If you don't hurry[,] she's going to die. I don't want that." When the police arrived, the operator asked defendant to come outside without the gun. Defendant could not do so, however, because Karen was blocking the stairway and he did not want to move her.

¶ 20    Sergeant Michael Gorzelanczyk and other officers responded to the call. As Gorzelanczyk walked to the garage, he saw a coffee pot on the ground. He entered the garage and called out to Karen. He heard labored breathing, and, on a staircase in the back of the garage, he saw Karen lying with an apparent gunshot wound in her head, bleeding from the head and chest. Defendant was cooperative with the police after they arrived. He pleaded with the police to help Karen, told

them he did not want to hurt or kill her but "she just kept pushing and pushing," and asked to see Karen to tell her he was sorry. When an officer asked defendant where he shot Karen, defendant responded, "I don't know[.] I think I hit her in the head and body, I don't know. *** I just got so enraged, I've never been so mad. She wouldn't leave me alone and I just started shootin[g] her." He later continued, "She just kept pushing and pushing. I just told her to leave. Get out. Leave me alone. 40 fucking years we've been married, she just couldn't." Defendant told the officers he did not know why he had shot Karen or how many times he hit her. He told them he never loaded the gun with more than five bullets and, when asked how many times he pulled the trigger, he responded, "I don't know. All [of] them." He also told the officers he tried to shoot himself, but one of the bullets would not fire, and he directed the officers to the live bullet on the floor. On several occasions, defendant expressed concern for how his sons and Karen's family would react to what had happened.

¶ 21    Karen was transported to Good Shepard Hospital, where she was pronounced dead. At the time of her death, her blood-alcohol content (BAC) was .124. Defendant was also transported to the hospital, and his BAC at that time was .05. Defendant later told the police he had drunk a "decent pour" of bourbon that night but was not sure if Karen had been drinking.

¶ 22    Around 4:40 a.m., Detectives Kevin Croke and Lori Allsteadt interviewed defendant at the Barrington police station. A video recording of the interview was admitted into evidence. Defendant waived his *Miranda* rights and provided details regarding the shooting, as set forth above. Additionally, he told the detectives that, because the revolver was a single-action revolver, he had to cock the gun before firing each shot. He again expressed remorse for his actions and concern for how his and Karen's family would react to the shooting, explained he became "enraged" during their argument and could not explain why he shot her, and stated his only intent

when he grabbed the gun was to harm himself. When Croke told defendant Karen "didn't make it," defendant responded, "I ruined so many damn lives."

¶ 23     On the issue of insanity, defendant's theory was that he suffered from PTSD, stemming from the grenade explosion in Vietnam (if not also physical and emotional abuse inflicted by his mother and sexual abuse inflicted by an older male during his youth). His PTSD was triggered when Karen pushed and grabbed him during their argument and then followed him up to his man cave, causing him to ultimately enter into a short, severe dissociative state in which he lacked substantial capacity to appreciate the criminality of his conduct. Defendant presented testimony of three expert witnesses to support his defense, who based their opinions, in part, on defendant's lack of recollection and inability to explain why he shot Karen.

¶ 24     As part of this theory, defendant presented evidence that, in addition to PTSD, he suffered from a mild cognitive impairment that was consistent with Alzheimer's disease and chronic traumatic encephalopathy (CTE). Specifically, Dr. Geeta Bansal recounted that, after she evaluated defendant and spoke to his family in 2016, she became concerned with defendant's cognition and, therefore, ordered a positron emission tomography scan (PET) scan. The PET scan revealed the temporal and parietal lobes of defendant's brain were not working properly, which affected defendant's short-term memory, emotional regulation, "fight or flight fear response," and attention processing and was consistent with the reports that defendant's cognition and skills had been deteriorating. According to Dr. Bansal, the mild cognitive impairment was a degenerative condition that had been developing for at least a year and would likely continue to deteriorate into Alzheimer's disease. The PTSD and CTE, according to Dr. Bansal, had "probably been going on for years" and were likely the result of defendant's prior history of head trauma, which included

multiple traumas inflicted by his abusive mother and the grenade explosion and other combat during the war.

¶ 25    The State presented the expert testimony of Dr. Roni Seltzberg to refute defendant's insanity claim. The State's theory was that defendant's actions on the night of the shooting were the result of an outburst of extreme anger, which may have been caused by alcohol use, and not a momentary dissociative state. Seltzberg opined that, regardless of whether defendant had PTSD, Karen yelling and grabbing at defendant did not trigger a dissociative state. She explained a person with PTSD would dissociate to the extent required for legal insanity only if the trigger was related to a prior trauma and, in this case, Karen yelling and grabbing defendant and coming up to the man cave was not related to any prior trauma defendant suffered. Further, defendant's immediate call to 911 and his recall of certain details, including knowing that Karen was coming up the stairs and seeing her in the doorway before shooting her, showed he was not in a dissociative state.

¶ 26                    C. The Court's Finding of Guilt

¶ 27    The court found the State had proved defendant committed first degree murder and that defendant had failed to prove, by clear and convincing evidence, that he was legally insane at the time of the shooting. See 720 ILCS 5/6-2(e) (West 2016). It relied on defendant's knowledge that Karen was pursuing him into the man cave when he shot her and that his acts of cocking the revolver before each shot and then emptying the cylinder before calling the police were conscious, knowing acts. The court nevertheless determined defendant felt threatened by Karen and subjectively believed he was in danger, even though that belief was unreasonable. Accordingly, it found defendant guilty of second degree murder.

¶ 28    The court thereafter denied defendant's posttrial motion.

¶ 29                        D. Sentencing

¶ 30    A presentence investigation report (PSI) indicated that defendant was born in 1950, making him 69 years old on the date of sentencing. At age 16, defendant left high school after he got into a fight with a teacher, and, at age 17, he enlisted in the Army with his father's permission. Defendant earned his general equivalency diploma while in the Army. He was honorably discharged in 1970, after having served 15 months in Vietnam and having earned several service medals. Defendant reported being steadily employed, in various capacities, after his discharge from the Army. Most recently, defendant was employed in information technology for a large corporation and worked the night shift so that he could "avoid situations that might trigger his anger." However, in 2013, at age 63, he was practically forced into retirement when his department was eliminated.

¶ 31    The PSI further indicated that, on June 1, 2009, defendant pushed another person to the ground after a traffic incident, and he received a citation for battery. In 2009, he pleaded guilty to that offense, was sentenced to four months' court supervision, and was ordered to pay fines and costs and to attend anger-management classes. Defendant's supervision was satisfactorily terminated. Otherwise, defendant had no criminal history, and the PSI stated defendant was a "[l]ow [r]isk to reoffend."

¶ 32    Additionally, the PSI showed defendant had complied with all conditions of his pretrial release and, after his release, he engaged in residential mental-health treatment, including an inpatient treatment program for veterans with PTSD. He then transitioned to the outpatient program and attended that, as well as other medical appointments, on a regular basis. At the time the PSI was prepared, however, defendant reported he was not currently "taking any medications for his health issues by his own choice." (At the sentencing hearing, the PSI was amended on its face to state "now on meds.") Defendant also reported that, in 2014, after he spent time with

Arellano, he went to the Veteran's Administration to seek mental-health treatment, as he was exhibiting signs of PTSD. It was recommended that he seek counseling for his PTSD, but defendant declined because he did not want to have his Firearm Owner's Identification card revoked or his guns removed from his possession. The PSI also set forth details of defendant's treatment while on pretrial release.

¶ 33    Detective Allsteadt testified in aggravation that, after defendant's arrest in this case, she spoke to Renee Lucas, who had contacted authorities after Karen's death. Lucas told Allsteadt about several incidents involving defendant in 2007. According to Allsteadt, Lucas often jogged on a desolate road near her house in Kildeer and would often encounter defendant, who would be driving his truck. As Lucas jogged in the roadway, defendant would purposefully drive right up next to her, sometimes crossing into the oncoming lane, causing Lucas to fear that he would strike her. On December 26, 2007, defendant drove so close to Lucas that she had to put her arm out to brace for an impact and then fell into a ditch, injuring her left arm. Lucas returned to her home and called 911. When Kildeer police officers arrived at her house, she learned defendant had already reported the incident, telling the police that a jogger hit his rear fender and expressing his discontent that the jogger would not "get out of the way when he is driving on the road."

¶ 34    Defendant presented Curtis's and Matthew's testimony in mitigation. They again stated the events leading to and including Karen's murder were an aberration, the two loved each other, there were never any signs of domestic abuse, and they did not believe defendant knowingly or intentionally killed Karen. They told the court that defendant's condition had improved while he was receiving treatment while on pretrial release. After the court found defendant guilty and remanded him, defendant had "given up" and his condition was deteriorating. Curtis and Matthew

asked the court to consider a sentence of probation so that defendant could receive the care and treatment he needed.

¶ 35    Defendant also submitted several letters from friends, family, and doctors. Defendant's friends and a former coworker expressed their surprise that defendant had killed Karen, citing their loving relationship, and asked the court for leniency. Kobinski asked the court to show leniency, as defendant would have to live with the consequences of his actions for the rest of his life. The letters from the treatment providers stated that, given defendant's diagnoses of Alzheimer's disease and PTSD, defendant's condition would likely continue to deteriorate, increasingly so if incarcerated, where proper treatment for defendant's diagnoses is generally unavailable. One of those letters cited studies that, on average, a person diagnosed with Alzheimer's disease typically only lives 11 years from the date of diagnosis. Thus, according to the letter, defendant had approximately eight more years to live.

¶ 36    Defendant made a statement in allocution, expressing remorse for his actions and respect for the court's decision.

¶ 37    In aggravation, the State argued Karen was a lovely woman and good neighbor, who was always seeking to improve herself, but that was "stripped away from her by defendant." The State noted Karen was entitled to continue her argument with defendant as he retreated into his man cave but, when she came up the stairs, "she was met with a barrage of bullets" and died a slow death as she bled out. The State further argued Karen should have been able to trust defendant to protect her but he did not do so. It also argued her death was the result of defendant leaving his own issues unaddressed for several decades, which included anger that was present well before his experiences in Vietnam. The State maintained defendant continued to pose a threat in his current

condition and asked the court to sentence him to the maximum 20-year term to deter others from committing similar crimes.

¶ 38    In mitigation, defendant again noted the loving relationship he had with his wife, as shown by the overwhelming weight of the evidence at trial and sentencing. Defendant also pointed out that the PSI stated he had a low risk of reoffending, as demonstrated by his lack of criminal history and his full compliance with all conditions of his pretrial release (which lasted approximately 3½ years). He also argued that his condition would continue to deteriorate, increasingly so if incarcerated, and that prison was not the appropriate place for him, given his condition. Defendant asked the court "to end this family's suffering by allowing [him] to continue receiving the care he needs and not sentence him to the penitentiary."

¶ 39    The court sentenced defendant to 16 years' imprisonment. In doing so, the court noted it had considered "everything before it," including the evidence presented at trial and at sentencing, defendant's statement in allocution, the parties' arguments, the PSI and its attachments, and the letters submitted on defendant's behalf. The court stated it had considered all the statutory and nonstatutory factors in aggravation and mitigation, as well as the constitutional command to fashion a sentence that takes into account retribution as well as rehabilitation. Specifically, the court noted that a sentence was necessary to deter others from committing similar crimes. It found aggravating that Karen had a right to feel safe in her home and that she most likely relied upon defendant to keep her safe, but defendant instead shot her multiple times. The court placed emphasis on defendant's actions, referring to them as "a horrible example of needless, senseless[,] destructive violence" and indicative of "the height of domestic violence that is discouraged in our society." The court found mitigating defendant's lack of criminal history and the effect a prison sentence would have on defendant's family. It also found there was no doubt defendant felt genuine

remorse for his actions. The court also noted it was cognizant of the doctors' opinions and of the services available and not available to defendant in prison.

¶ 40    Defendant moved to reconsider his sentence, which he later amended. The amended motion again highlighted his deteriorating condition, as recounted by his sons and the expert witnesses, his family's disbelief that he intended to kill Karen, and his family's and doctors' pleas for leniency so that he could continue to receive care for his condition. He noted evidence that showed a prison sentence would be detrimental to his condition. Defendant also emphasized his lack of criminal history, the PSI's statement that he was a low risk to reoffend, and his remorse for his actions. He asserted the court placed too much weight on the aggravating factors and failed to properly consider the mitigating evidence.

¶ 41    The court denied the motion, and this appeal followed.

¶ 42                                    II. ANALYSIS

¶ 43    On appeal, defendant contends the trial court abused its discretion in imposing a 16-year sentence. Specifically, he argues the trial court placed "too much emphasis" on deterrence and failed to give appropriate weight to several mitigating factors apparent and, as a product thereof, imposed an excessive sentence.

¶ 44    The Illinois Constitution states "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To achieve the constitutionally mandated balance between the retributive and rehabilitative purposes of punishment, the trial court must carefully consider all aggravating and mitigating factors, including "the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well

as the nature and circumstances of the crime and of defendant's conduct in the commission of it."
*People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 45    The trial court, not the reviewing court, is in the best position to assess these factors because it has observed the defendant and the proceedings. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). Accordingly, the trial court has broad discretionary powers in imposing a sentence, which are entitled to great deference. *Id.* at 212. We do not reweigh the evidence in aggravation and mitigation or substitute our judgment for that of the trial court merely because we would have weighed these factors differently. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Instead, we will overturn a sentence only when the trial court has abused its discretion. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. An abuse of discretion occurs when the court's sentence "is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16.

¶ 46    After reviewing the record, we conclude the trial court did not abuse its discretion when it sentenced defendant to 16 years' imprisonment. The offense of second degree murder is a Class 1 felony, which has a statutorily mandated sentencing range of 4 to 20 years' imprisonment. 720 ILCS 5/9-2(d) (West 2016); 730 ILCS 5/5-4.5-30(a) (West 2016). Because defendant's 16-year sentence fell within the applicable sentencing range, we presume the sentence is proper. *Charleston*, 2018 IL App (1st) 161323, ¶ 16. This presumption will be rebutted only if defendant makes an affirmative showing the sentence greatly departs from the spirit and purpose of the law or the constitutional guidelines. *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992). Defendant has not made such a showing.

¶ 47    Defendant argues the trial court placed "too much" weight on the need for deterrence and its finding that defendant occupied a position of trust over Karen (in the sense that Karen likely

trusted defendant to protect her) and made no mention of or placed minimal weight on several applicable mitigating factors. According to defendant, those mitigating factors included (1) his rehabilitative potential, (2) his steady employment history, (3) his family support, (4) his minimal criminal history, which included only one prior conviction for which he successfully completed a term of supervision, (5) the PSI's statement that he was a "low risk to reoffend," and (6) the fact he complied with all terms of his pretrial release. He also asserts there is no dispute he suffered from serious mental illnesses, including cognitive impairment that is consistent with Alzheimer's, PTSD, and CTE, and argues that his condition, though insufficient to establish a defense, substantially affected his ability to understand the nature of his actions. Finally, he argues imprisonment endangers his medical condition, where the evidence established he would likely age faster in prison as a result of his cognitive impairment, and his 16-year sentence amounted to a "*de facto* life sentence" imposed without regard to his demonstrated rehabilitative potential.

¶ 48    Defendant essentially asks this court to reweigh the evidence in aggravation and mitigation and substitute our judgment for that of the trial court. Indeed, he argues the trial court placed "too much" weight on the aggravating factors and "failed to properly consider" or "give appropriate weight" to the mitigating factors. We decline to reweigh the evidence and substitute our judgment for that of the trial court. *Stacey*, 193 Ill. 2d at 209.

¶ 49    Moreover, the record belies defendant's assertion that the trial court failed to appropriately consider the mitigating factors. There exists a presumption the court considered all mitigating factors supported by the record absent some affirmative indication, other than the sentence itself, to the contrary. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55. And the court "need not detail precisely for the record the exact thought process undertaken to arrive at the ultimate sentencing decision or articulate its consideration of mitigating factors." *People v. Abrams*, 2015 IL App (1st)

133746, ¶ 32. Here, the record shows all the mitigating evidence on which defendant relies was before the court in the evidence presented at trial and at sentencing and the PSI and was extensively argued by defendant either at sentencing, in his motion to reconsider sentence, or both. Further, the court stated it had considered everything it had been presented in reaching its sentence, specifically mentioning defendant's lack of criminal history, his genuine remorse, the hardship a sentence of imprisonment would cause defendant's family, and its cognizance of defendant's doctors' opinions and the availability (or lack thereof) of services for defendant in prison. That the court did not mention certain mitigating evidence does not mean the court did not consider that evidence. See *id.*

¶ 50    Here, the record shows the trial court carefully considered all the mitigating evidence presented to it and ultimately determined the need for deterrence warranted a sentence of imprisonment. Though there existed ample evidence for the court to consider in mitigation, including that emphasized by defendant in this court, the trial court was not obligated to place any more weight on those factors than on the need to deter others from committing similar crimes. *People v. Malin*, 359 Ill. App. 3d 257, 265 (2005); see also *People v. Cunningham*, 2018 IL App (4th) 150395, ¶ 27 (the need for deterrence is proper factor to consider in imposing sentence). Defendant has not pointed to anything in the record, other than the length of the sentence and the court's failure to specifically mention certain mitigating factors, that indicates the court did not consider the mitigating evidence before it. While we are not unsympathetic to defendant's condition and his need for continued care, we cannot conclude the sentence imposed "is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16. Accordingly, we conclude the trial court did not abuse its discretion in imposing defendant's 16-year sentence.

¶ 51                                    III. CONCLUSION

¶ 52    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 53    Affirmed.