2019 IL App (1st) 180503

FIRST DISTRICT
THIRD DIVISION
September 30, 2019

No. 1-18-0503

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 C3 30219 |
| | ) | |
| STACEY GROEBE, | ) | Honorable |
| | ) | Steven M. Wagner, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court, with opinion.
Presiding Justice Ellis and Justice Cobbs concurred in the judgment and opinion.

OPINION

¶ 1    Following a bench trial, defendant, Stacey Groebe, was convicted of aggravated driving under the influence of alcohol (aggravated DUI) for committing DUI while having three previous convictions for DUI or an equivalent offense. Due to defendant's prior convictions, she was sentenced as a Class 2 offender to three years in prison. On appeal, defendant contends that (1) her right to a public trial was violated when the video recording of the traffic stop and field sobriety tests preceding her arrest was viewed by the trial court in chambers and was not played in open court, (2) the evidence was insufficient to show she was under the influence of alcohol, and (3) the trial court's remarks summarizing its ruling erroneously shifted the burden of proof to the defense. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    Defendant was charged with the Class 2 felony version of aggravated DUI for driving under the influence of alcohol while having three previous DUI violations (625 ILCS 5/11-

501(d)(1)(A), (d)(2)(C) (West 2016)). Defendant also was charged with the Class 4 felony version of aggravated DUI for driving under the influence of alcohol while her driving privileges were revoked or suspended for a prior DUI violation or for a similar offense (id. § 11-501(d)(1)(G), (d)(2)(A)).

¶ 4    At trial, Roselle police officer David Hourigan testified that at about 2 a.m. on April 1, 2017, he was in a police vehicle in the area of Plum Grove Road and Nerge Road. Hourigan saw two people leave the Strike Ten Lanes & Lounge at closing time and get into a blue Ford Escape. The individuals sat in the vehicle with the headlights on for about 15 minutes.

¶ 5    Hourigan drove past the Escape and saw three people seated inside. He parked across the street and started to run a registration check on the Escape. Meanwhile, the Escape left the parking lot and drove north on Plum Grove Road. Hourigan followed the Escape as it turned onto Oriole Road. The Escape parked on the right side of the street with the interior lights on.

¶ 6    Hourigan drove past the Escape, proceeded two blocks and turned around on Oriole Road, passing the Escape from the other direction and noting the interior lights were still on. Hourigan drove back to Plum Grove Road, parked, and continued to run a registration check on the vehicle. Hourigan drove to where the Escape had been parked and noted it was no longer there. A few minutes later, he saw the Escape turn back onto Oriole and saw the headlights turn off; Hourigan lost sight of the vehicle again and then saw it with its headlights back on.

¶ 7    Hourigan followed the Escape north onto Plum Grove Road. The Escape was in the left lane, moved to the right lane after the right turn signal was engaged, and then returned to the left lane. According to Hourigan, it "straddled the lane line for maybe a hundred feet, 200 feet" with no turn signal on. The Escape then returned to the right lane.

¶ 8    Hourigan activated his vehicle's emergency lights to initiate a traffic stop. The Escape continued driving for about two blocks before stopping on the right side of Plum Grove Road. When Hourigan approached the Escape, he observed defendant in the driver's seat, a man in the passenger seat, and a woman in the back seat behind the man.

¶ 9    Defendant told Hourigan she was "looking for my insurances [*sic*]" and spoke in a slurred manner. He asked her to step out of the vehicle. Hourigan testified that the defendant's eyes were "glassy and red and there was a strong odor of an alcoholic beverage coming from the vehicle and her breath." Hourigan told her to walk to the rear of the Escape and asked for her driver's license, which she said was at home. Defendant told Hourigan she was driving a friend home to Orland Park.

¶ 10    When Hourigan asked defendant's name, she initially responded, "Stacey Groebe." She then told Hourigan her name was Ashley Neven and stated she was just married. She gave Hourigan her date of birth. Defendant said she was from Palos Hills, which she described as being "just down the road like 15 minutes." Hourigan performed an Internet search for Palos Hills and learned it was "35 to 39 minutes" away from the location of the traffic stop. Defendant denied consuming alcohol when asked by the officer.

¶ 11    Hourigan administered field sobriety tests, starting with the horizontal gaze nystagmus (HGN) test. He testified he had performed "thousands" of HGN tests and had received training in performing that test in accordance with National Highway Traffic and Safety Administration (NHTSA) standards. The test was administered by the officer holding a pen and moving it in front of the subject's face. Hourigan told defendant to watch the pen with her eyes only and watch it move from side to side without moving her head. Defendant was able to follow his

instructions and her eyes equally tracked the pen; however, Hourigan observed "in both eyes [ ] a lack of smooth pursuit" and "a distinct and sustained nystagmus at maximum deviation." Hourigan testified those factors indicated that defendant had consumed alcohol.

¶ 12    Hourigan next administered the one-leg stand test, directing defendant to keep her hands at her sides and hold one foot straight about six inches off the ground while counting aloud for 30 seconds. Hourigan demonstrated the test to defendant. He testified that when performing the test, defendant "hopped" and "lifted her arms [ ] almost to a 90-degree angle." Defendant swayed and was unable to maintain her balance, and she lowered her foot on counts 9 and 12. Also, after counting for 30 seconds, defendant counted to 48, at which point Hourigan told her to stop.

¶ 13    Hourigan then administered the walk-and-turn test. He directed defendant to stand on the white line at the road's edge with one foot in front of the other and her hands at her sides. Hourigan demonstrated nine steps, touching his heel to his toe and counting aloud with each step, and he turned and walked back the same way. Defendant said she understood those instructions. Hourigan stated that defendant initially "was unsteady on her feet, swaying from side to side" and "went down to count 5 and then just stopped and appeared to [ ] lose her balance." Defendant returned to the starting point and began again, stepping off the line and not touching her heel to her toe at several points. After defendant turned, her feet "were out of alignment from side to side and she was using her arms." Hourigan could not hear defendant counting aloud.

¶ 14    Hourigan asked defendant to take a preliminary breath test, which she refused. Defendant was arrested. An open, half-full bottle of vodka was recovered from the front passenger side of the vehicle, along with an Illinois identification card for Stacey Groebe displaying a different

date of birth than the date she gave Hourigan. Defendant also refused to take a breath test at the police station.

¶ 15    Hourigan testified that defendant was under the influence of alcohol based on her failure to complete the sobriety tests and her "slurred speech, the odor of alcoholic beverage on her breath, the glassy red eyes, her responses to questions." Hourigan further noted the "time and location" of the traffic stop, the fact that defendant drove over the lane lines, her failure to immediately stop when he activated his emergency lights, and the fact that she was driving in "the opposite direction from home." Hourigan also based that opinion on "the observations I made on the [HGN] test" and defendant's failure to properly complete the one-leg stand test and the walk-and-turn test.

¶ 16    The State referred to a video recording of the traffic stop and defendant's performance of the field sobriety tests taken from the dashboard camera in Hourigan's police car.[1] Hourigan stated that he had reviewed the video prior to his testimony and that the video represented a true and accurate recording of the events. Defense counsel said it would "stipulate to the video."

¶ 17    On cross-examination, Hourigan described his administration of the HGN test. He said he took into account defendant's statement to him that she was on three prescription medications. Hourigan did not see defendant fall or stumble when walking from the bowling alley to the car, and she got out of the car without assistance during the traffic stop. Defendant committed a traffic violation of improper lane usage.

---

[1]The record on appeal includes a copy of the video recording, which this court has viewed.

¶ 18     After Hourigan's testimony, the State asked to admit into evidence a copy of defendant's certified driving abstract, which indicated that she had two prior DUI convictions in Illinois and that her driver's license was revoked when these events occurred.

¶ 19     After defense counsel initially objected to the admission of the driving abstract, the court stated it would "take the opportunity during the lunch break not only to watch the video but of course to review any case law" regarding the admission of the driving abstract. Further discussion took place, after which defense counsel stated that the defense had "no objection" either to the admission of the video recording or the driving abstract.

¶ 20     The video recording, defendant's driving abstract, and other exhibits were admitted into evidence. The court stated that the video would be "admitted into evidence and published to the court." Before adjourning for lunch, the court again remarked that it would "watch the video."

¶ 21     When the case was recalled, the court stated it had watched the video. The State rested its case-in-chief, and the defense moved for a directed verdict, which the court denied.

¶ 22     The defense called three witnesses who were with defendant on the night of these events. Amy Joslyn testified that she lived in Palos Hills and had known defendant for five years. She, defendant, Bhavik Patel (who sometimes went by the name "Bob"), and Jonathan Kermer went to Strike Ten and left at about 2 a.m.

¶ 23     Patel, who was Joslyn's boyfriend, began having an epileptic seizure, and the group remained in the parking lot until about 2:30 a.m. After leaving the parking lot, defendant stopped on a street off of Plum Grove Road because Patel said they were going the wrong way to his house, where he needed to retrieve medication. Joslyn called Uber for a ride for Patel, and he was picked up while they remained on the side street. Joslyn testified she called a ride for Patel

because he could only mumble and she did not know his address. Defendant was driving towards Interstate 290 when she was stopped.

¶ 24     On cross-examination, Joslyn stated she drove the Escape to Strike Ten with defendant, Patel, and Kermer to celebrate Kermer's birthday. They arrived between 10 and 11 p.m. and she drank "[m]aybe two drinks and a couple of shots." Defendant did not drink any alcohol. Joslyn did not notice anything unusual about defendant's speech, gait, or driving or see any alcohol in the Escape. On redirect examination, Joslyn said the customary treatment for Patel's seizures was to "[j]ust wait it out."

¶ 25     Patel offered testimony consistent with that of Joslyn regarding the night's events and his affliction, which he described as a "partial" seizure. Patel testified he had "maybe three beers" at the bowling alley. He did not think defendant was impaired while they were at Strike Ten but was speaking with friends and did not talk to defendant much while they were there.

¶ 26     Kermer testified the group went together to Strike Ten to celebrate his birthday. He was picked up by Joslyn and defendant in the Escape; he brought a bottle of vodka and drank some during the ride to Strike Ten. Defendant did not drink the vodka, and Kermer did not see her drink alcohol at Strike Ten. When the group left Strike Ten, Kermer was driving at first. Then defendant drove, and Kermer sat in the passenger seat. Just before the Escape was pulled over, defendant was looking at a map on a cell phone.

¶ 27     In finding defendant guilty of aggravated DUI, the court stated that Hourigan's testimony was credible and unimpeached as to his observations of the vehicle driven by defendant. In its ruling, the court noted:

"The field sobriety tests were [ ] administered and captured on People's Exhibit No. 3 in evidence without objection. The video further corroborated the officer's observations of the investigation and his testimony on the witness stand."

¶ 28     Defendant filed a motion for a new trial, raising the issues now argued on appeal. At a hearing on the motion, the defense argued that the trial court's viewing of the video in chambers violated defendant's right to a public trial. The defense acknowledged it did not challenge the admission of the DVD into evidence or ask that the video be played in open court. However, counsel asserted that defendant did not waive her right to a public trial and that the public had a right to view the video. The trial court denied defendant's motion for a new trial.

¶ 29     At sentencing, the State referenced defendant's certified driving abstract showing two prior DUI violations in Illinois. The State also presented a certified sentencing order from Jefferson County, Colorado, indicating that in 2009, defendant pled guilty to the offense of "driving while ability impaired." The trial court found that because defendant had three prior convictions for DUI or an equivalent offense, her conviction in this case constituted a Class 2 felony. The trial court sentenced her to three years in prison.

¶ 30                                                 II. ANALYSIS

¶ 31     On appeal, we first consider defendant's argument that her right to a public trial was violated when the trial court viewed the video recording of the traffic stop and field sobriety tests in chambers during a break in the trial. She contends the video contained evidence that was central to her case and that the court's viewing of the video outside of the courtroom undermined public confidence in her trial and conviction.

¶ 32    A defendant's right to a public trial is guaranteed by the sixth amendment, applicable to the states through the fourteenth amendment. U.S. Const., amends. VI, XIV; *Gannett Co. v. DePasquale*, 443 U.S. 368, 379-80 (1979). The right to a public trial protects the defendant and is designed to (1) ensure a fair trial, (2) encourage the prosecution and the trial court to carry out their duties responsibly, (3) encourage witnesses to come forward, and (4) discourage perjury. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 41 (citing *Waller v. Georgia*, 467 U.S. 39, 46 (1984)). "Openness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously, and generally give the public an opportunity to observe the judicial system." *Gannett*, 443 U.S. at 383. A violation of the right to a public trial constitutes structural error, which requires automatic reversal without the need for the defendant to demonstrate prejudice. *Neder v. United States*, 527 U.S. 1, 8 (1999); *People v. Thompson*, 238 Ill. 2d 598, 608-09 (2010).

¶ 33    The sixth amendment protects all portions of the trial beginning with *voir dire*. *Presley v. Georgia*, 558 U.S. 209, 212-13 (2010). The general public interest is present anytime the judge or attorneys take action, as it ensures that the judge and the prosecution carry out their duties responsibly. *Waller*, 467 U.S. at 46; *People v. Gore*, 2018 IL App (3d) 150627, ¶ 32; *People v. Taylor*, 244 Ill. App. 3d 460, 463 (1993).

¶ 34    Defendant argues that because her right to a public trial encompasses the presentation of evidence, the video of her traffic stop should have been played in the courtroom. She maintains that the court's act of viewing the video in chambers was comparable to closing the courtroom to the public.

¶ 35    The State counters that defendant cannot seek review of this claim on appeal because the trial court repeatedly mentioned in advance that it would watch the video in chambers and the defense raised no objection to the manner in which the court proceeded. The State further asserts that the court's viewing of the video in chambers did not implicate defendant's right to a public trial because exhibits such as videos or photographs are not required to be published in open court.

¶ 36    We initially note that, although defendant frames this issue as a violation of her right to a public trial, our research has not unearthed an Illinois case, nor have the parties cited any, that discusses whether the consideration of evidence by the trier of fact outside of the courtroom violates a defendant's right to a public trial. Illinois cases addressing a defendant's right to a public trial have largely involved the trial court's actual closure of the courtroom for some portion of the trial or the exclusion of some individuals from the courtroom. See, *e.g.*, *People v. Radford*, 2018 IL App (3d) 140404, ¶ 60 (applying triviality standard, the court's partial closing of courtroom during *voir dire* did not implicate public-trial right); *Jones*, 2014 IL App (1st) 120927, ¶¶ 44-45 (right to a public trial not violated when a portion of *voir dire* was held in chambers); *People v. Hayden*, 338 Ill. App. 3d 298, 306 (2003) (some members of defendant's family excluded from courtroom during *voir dire*); *People v. Webb*, 267 Ill. App. 3d 954, 958-59 (1994) (defendant's grandmother readmitted to courtroom after partial *voir dire*); *People v. Lane*, 256 Ill. App. 3d 38, 55 (1993) (public excluded from jury selection). Here, there was no such closure of the courtroom or exclusion of individuals from the courtroom.

¶ 37    While the right to a public trial encompasses the right to publicly present evidence and witnesses (*People v. Cooper*, 365 Ill. App. 3d 278, 282 (2006)), the issue in this case is whether

that right applies where properly admitted evidence is later viewed outside the courtroom by the trier of fact. In this case, the record shows that the trial court, as the trier of fact, viewed in its chambers a video of the traffic stop and field sobriety tests that had been admitted into evidence. Although that video was not played in the courtroom during Hourigan's testimony, the officer testified that he reviewed the video before his testimony and that the video represented a true and accurate recording of the traffic stop and defendant's performance of the field sobriety tests. See, *e.g.*, *People v. Dennis*, 2011 IL App (5th) 090346, ¶ 22 (a video recording may be introduced as substantive evidence if it is authenticated with testimony of a witness that the recording accurately represents what he or she previously saw or heard). Defense counsel stipulated to the admission of the video at trial and raises no question on appeal as to the video's admissibility.

¶ 38    In arguing that the video of her traffic stop had to be shown in the courtroom, defendant concedes that other evidence, such as photographs, are admitted at trial and are viewed by the trier of fact outside the courtroom. She contends that photographs differ from the video at issue in this case because photographs are "typically authenticated and described via testimony that provides the public with an indication of their content and significance to the proceedings." However, that is not a distinction here because the video was authenticated by Hourigan. The court's viewing of that evidence in chambers did not implicate defendant's right to a public trial.

¶ 39    In the absence of Illinois cases directly on point, a search of similar issues in other jurisdictions supports our conclusion that the court's actions here did not implicate the right to a public trial. Last year, the Kansas Supreme Court addressed an analogous situation and concluded the defendant's right to a public trial was not implicated, much less violated. In *State v. Sullivan*, 414 P.3d 737, 739-40  (Kan. 2018), the defendant was charged with criminal acts for

attacks on three women, and police questioning of the defendant in an interrogation room was audio- and video-recorded. Two audio recordings were admitted into evidence and played in open court. *Id.* at 740. The trial court also admitted into evidence six hours of DVD video recordings that were not played in open court, and the jury was allowed to take the DVDs into the jury room while it deliberated. *Id.* The defendant argued unsuccessfully in a posttrial motion that the trial court erred in allowing the videos "to be entered into evidence." *Id.* at 742. The Kansas Supreme Court concluded that the defendant did not "present a circumstance that implicates his right to a public trial." *Id.* That court noted that the public was at no point excluded from the trial and the defendant did not claim that the public was effectively excluded by the manner in which the DVDs were handled. The court further noted the "foundation for the exhibit was laid in open court [and] it was proffered into evidence in open court." *Id.* at 744.

¶ 40    In the case at bar, as mentioned, there was no closure of the courtroom or exclusion of the public from the courtroom. Rather, the foundation for the video of defendant's traffic stop was laid in open court, and the video was proffered into evidence in open court. The right to a public trial is not implicated where evidence is presented in open court, and that right does not extend to the viewing of exhibits by the public. See *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 564-74 (1980) (plurality opinion) (discussing the public-trial right in terms of public attendance). Instead, the right to a public trial under the sixth amendment "is satisfied by the opportunity of members of the public to attend the trial and to report what they have observed." *People v. Jones*, 265 Ill. App. 3d 627, 641 (1994). For all of those reasons, we conclude that the trial court's viewing of the traffic-stop video in chambers did not implicate, much less violate, defendant's right to a public trial.

¶ 41    In support of her argument that her right to a public trial was violated, defendant relies largely on *United States v. Lnu*, 575 F.3d 298 (3rd Cir. 2009). Our examination of that case does not support defendant's contention that her right to a public trial was implicated.

¶ 42    In *Lnu*, participants at a federal drug conspiracy trial listened on headphones to audio recordings of conversations that were entered into evidence. *Id.* at 299-300. At the morning trial session, the public loudspeaker that would have broadcast those recordings in the courtroom was turned off. *Id.* The defendant argued that the failure to broadcast the conversations in the courtroom violated his right to a public trial. The federal district court denied the defendant's motion for a mistrial or to strike the testimony elicited based on the recordings but ordered that the remaining recorded conversations be played at trial over the loudspeaker. *Id.* at 300.

¶ 43    The federal appeals court affirmed, holding that the inability of the public to hear the recordings as they were played for the trial participants did not violate the defendant's right to a public trial under the sixth amendment. *Id.* at 306-07. The court noted that the right to a public trial " 'is satisfied by the opportunity of the public and the press to attend the trial and to report what they have observed.' " *Id.* at 306 (quoting *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 610 (1978)). While acknowledging that those in the courtroom could not listen to the recordings at the same time the trial participants heard them, thus limiting the public's ability to understand the proceedings, the appeals court found that did not "rise to the level of a Sixth Amendment violation." *Id.* at 306-07. The court observed, for one, that written documents on which witnesses base their testimony at trial are not "simultaneously displayed to the public." *Id.* at 307.

¶ 44    The appeals court further stated in *Lnu*:

"The contextual deprivation that occurred here was not of any constitutional import. It did not infringe on the Sixth Amendment any more than the accepted practices of denying the public simultaneous access to documentary evidence, bench interchanges or conferences in chambers. The Government routinely elicits testimony about a photograph without also simultaneously displaying the photograph on a courtroom projector for the public to see. That the present case involved audiotapes instead of photographs or other documentary evidence does not alter the constitutionality of the proceedings." *Id.*

¶ 45 Although *Lnu* found no violation of the right to a public trial, defendant argues a different result is required here. Defendant contends that the absence of the recordings in *Lnu* only denied the public the ability to place portions of the trial testimony in context, while the video of her traffic stop was central to the State's case. However, instead of bolstering defendant's case, the discussion in *Lnu* supports our conclusion that the action in this case did not implicate defendant's public-trial right. The court in *Lnu* expressly described the analogous situation of introducing documentary evidence, such as a photograph, that is not simultaneously displayed to the public. Similarly here, the fact that the video was not viewed by the trier of fact in open court did not infringe on defendant's sixth amendment right any more than denying the public simultaneous access to documentary evidence.

¶ 46 In reaching this conclusion, we briefly note that, throughout her argument, defendant refers to the fact that she and her counsel were not present when the trial court viewed the video in chambers. However, defendant does not expressly assert a violation of her right to be present when the video was viewed, and her brief contains no legal authority on that point. Therefore,

that issue was not properly raised in this court. See *People v. Land*, 2011 IL App (1st) 101048, ¶ 163 (a party waives consideration of a point by failing to offer argument or cite supporting legal authority in their opening brief). Nonetheless, this court granted defendant's motion to cite *People v. Lucas*, 2019 IL App (1st) 160501, as additional authority relevant to this appeal. In *Lucas*, the trial court watched a video recording of the defendant's traffic stop in chambers in the presence of the prosecutor and the defendant's attorney. *Id.* ¶ 6. The defendant argued that, in doing so, the trial court violated her right to be present at a critical stage of her proceeding. *Id.* ¶ 10. The courtroom procedure required the court to view the video in chambers because the necessary equipment was not in the courtroom. *Id.* ¶ 5. The attorneys were not allowed to comment, and no questions were asked. *Id.* The trial court admitted the video into evidence and, following arguments, found the defendant guilty of the offenses charged. *Id.* ¶¶ 6-7. In finding the defendant guilty, the trial court "explicitly stated it relied on the video and [the arresting officer's] testimony." *Id.* ¶ 7. The State argued, in part, that the defendant "affirmatively waived this issue by acquiescing to the trial court viewing the video in chambers after the court explained the parties' stipulation [to the authenticity of the video] and the courtroom procedure." *Id.* ¶ 11.

¶ 47     In this case, the State had cited a prior version of the *Lucas* decision in support of its argument that defendant acquiesced to the trial court's procedure for reviewing the video. In *Lucas*, this court had held that the defendant in that case affirmatively waived any objection to the trial court's procedure for viewing the video in that case but this court granted the *Lucas* defendant's petition for rehearing and issued a new opinion holding that Lucas had not affirmatively waived any objection to the trial court's procedure. *Id.* ¶ 14. One justice dissented,

finding Lucas had waived her claim that she was denied her right to be present at a critical stage of her trial. *Id.* ¶ 27 (Lavin, P.J., dissenting). Thus, the State in this case agreed with defendant that the new *Lucas* decision is pertinent to the resolution of this case and that it therefore had "no objection to her motion to cite the case as additional authority"; however, the State argued the "*Lucas* majority wrongly rejected the affirmative waiver which occurred in that case and assert[ed] that Justice Lavin's dissent is a more accurate accounting of the applicable law." The State in this case also argued that "*Lucas* involved a different legal claim and was litigated under a different constitutional theory than this case has been briefed." The State contended that defendant here never argued that she was deprived of her right to be present at a critical stage of the proceedings and that her sole argument on appeal was that the trial court violated her right to a public trial.

¶ 48    We allowed defendant to file a reply to the State's response to her motion to cite additional authority in which defendant argued (1) the majority opinion on waiver is the applicable precedent and not the dissent, (2) the situation is "more egregious than the one in *Lucas*" because in *Lucas* the attorneys were present when the trial court viewed the video but here no one else was present when the trial court viewed the video, and (3) regardless of whether defendant raised the "present during a critical stage" theory in her opening brief, "the error was plain and of constitutional dimension" and should be reviewed by this court.

¶ 49    We did not find that defendant acquiesced to the trial court's procedure for viewing the video in this case. We found that the trial court's procedure for viewing the video did not implicate, much less violate, defendant's right to a public trial. *Supra* ¶ 38. Therefore, the *Lucas* court's discussion of the defendant's waiver of her right to be present in that case is inapposite.

Defendant's assertion that, in light of *Lucas*, this case is "more egregious" because here, unlike in *Lucas*, her attorney was not present when the trial court viewed the video is unreasoned where the *Lucas* court found "[t]hat Lucas's counsel viewed the video in chambers is beside the point." *Lucas*, 2019 IL App (1st) 160501, ¶ 20. The basis of the *Lucas* court's decision was the impact on the defendant's ability to aid in her own defense and to decide whether to testify. *Id.* ¶¶ 15, 19. Regarding the presence of the attorneys, the *Lucas* court only noted that the defendant's attorney had no power to waive Lucas's right to be present (*id.* ¶ 14) and that her attorney's "gloss on the evidence is no substitute for her own knowledge" of the video's contents when deciding whether to testify in her own defense (*id.* ¶ 20). In this case, defendant has not argued that her attorney inappropriately waived her right to be present at a critical stage of the proceedings or that her "attorney's gloss" on the contents of the video negatively impacted her ability to aid in her defense or her decision not to testify. Therefore, the presence or absence of the attorneys when the trial court viewed the video is irrelevant.

¶ 50    As for defendant's claim that she can argue for the first time in support of her motion to cite additional authority that her right to be present at a critical stage of proceedings was violated, defendant argues "a reviewing court need not ignore grave errors of law which the parties on appeal either overlook or decline to address." *People v. Cortes*, 181 Ill. 2d 249, 282 (1998). As stated previously, we did not address whether defendant waived her right to a public trial. Assuming, *arguendo*, defendant can raise the argument she was denied her right to be present at a critical stage of the proceedings, we initially note that "the trial court is permitted to accept a waiver of a defendant's constitutional right to be present from defense counsel. [Citations.] However, '[d]efense counsel may waive a defendant's right to be present only if the

defendant voluntarily, knowingly, and intelligently waived his right.' [Citation.]" *People v. Phillips*, 383 Ill. App. 3d 521, 549-50 (2008). Moreover,

> "a defendant's presence is not required when presence would be useless, or the benefit but a shadow. [Citation.] The touchstone of this analysis is whether the defendant's presence at the proceeding would have contributed to his opportunity to defend himself against the charges. [Citation.] Whether a stage of trial is a critical stage is a question of law that we review *de novo*." (Internal quotation marks omitted.) *People v. Young*, 2013 IL App (4th) 120228, ¶ 23.

¶ 51 We need not decide whether defendant waived her right to be present through her counsel.

> "Even where a defendant has the general right to be present because the proceeding is a 'critical' stage, a defendant's absence is not a *per se* constitutional violation. Rather, a defendant's absence from such a proceeding will violate his constitutional rights only if the record demonstrates that defendant's absence caused the proceeding to be unfair or if his absence resulted in a denial of an underlying substantial right." (Internal quotation marks omitted.) *Phillips*, 383 Ill. App. 3d at 551.

Defendant has not argued, nor do we find, that defendant's absence when the trial court viewed the video caused the proceeding to be unfair or resulted in a denial of an underlying substantial right. The underlying right at issue is "rooted to a large extent in the Confrontation Clause." (Internal quotation marks omitted.) *Lucas*, 2019 IL App (1st) 160501, ¶ 15. "[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its

outcome *if [her] presence would contribute to the fairness of the procedure*. [Citations.]" (Emphasis in original and internal quotation marks omitted.) *Id.* ¶ 12. Here, Officer Hourigan testified to the events of the traffic stop and arrest, testified that he reviewed the video, and testified that the video was "a true and accurate recording of the events that occurred." Defendant's attorney cross-examined the officer on the manner in which field sobriety tests were performed and defendant's performance of the tests; the officer's observations before the traffic stop, including the manner in which the car was driven; and the officer's observations and defendant's conduct during the traffic stop. In support of a motion for a directed verdict, defendant's attorney argued the video contradicted the officer's testimony. The trial court found that the officer's testimony was credible and had not been impeached. The trial court found that the video corroborated the officer's testimony.

¶ 52    In this case, we cannot find that defendant "was not afforded the opportunity to confront the evidence against her and aid in her defense." *Id.* ¶ 15. Defendant's attorney challenged the evidence and relied on the video to contest the officer's testimony. Further, defendant has pointed to no statements by the trial court, referencing what was depicted in the video as forming an independent basis for its judgment. *Cf. id.* ¶ 7 ("The court noted that the video showed Lucas's driving was 'disturbing' and that she was 'belligerent' and admitted to drinking alcohol."). On the contrary, the court found the defense witnesses not credible because of material inconsistencies in their testimony and their own intoxication at the time of events to which they testified. However, the court did not rely on the defense witnesses' lack of credibility in determining whether "defendant is or isn't guilty of the offenses." There is no argument or anything to suggest the trial court's procedure prejudiced defendant's ability to aid in her defense or to decide whether to testify. See *id.* ¶¶ 15, 20. Under the circumstances, we cannot find that

defendant's presence when the trial court viewed the video would have contributed to the fairness of the proceedings. *Id.* ¶ 12. Accordingly, defendant's right to be present at a critical stage of trial was not violated.

¶ 53    Defendant next contends that the State did not prove beyond a reasonable doubt that she drove while under the influence of alcohol because Hourigan's testimony, the video recording of the traffic stop, and the field sobriety tests did not establish her impairment. She also contends that the video contradicts Hourigan's testimony and that the officer did not administer the field sobriety tests in compliance with recognized standards.

¶ 54    When reviewing a challenge to the sufficiency of the evidence, the court must determine if, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Belknap*, 2014 IL 117094, ¶ 67. A reviewing court does not retry the defendant and will only reverse a criminal conviction if the evidence is so unsatisfactory as to raise a reasonable doubt of the defendant's guilt. *People v. Bradford*, 2016 IL 118674, ¶ 12. Where, as in this bench trial, the trial court is the trier of fact, the reviewing court generally will not substitute its judgment for that of the trial court as to conflicts in the testimony, the weight to be given to the testimony, the inferences to be drawn from the evidence, and the credibility of witnesses. *Id.*

¶ 55    As relevant here, a person commits the offense of aggravated DUI when she drives or is in actual physical control of a vehicle while under the influence of alcohol and has at least two prior DUI convictions. 625 ILCS 5/11-501(d)(1)(A), (d)(2)(B) (West 2016). In order to sustain defendant's conviction for this offense, the State was required to prove beyond a reasonable

doubt that she (1) was in control of a vehicle, (2) was under the influence of alcohol, and (3) had at least two prior convictions for DUI.

¶ 56    Defendant does not dispute her prior convictions or that she was driving or in actual physical control of the vehicle. Rather, she solely argues that the evidence was insufficient to establish that she was under the influence of alcohol.

¶ 57    The State was required to prove that defendant was under the influence of alcohol. A defendant is under the influence of alcohol when, as a result of consuming alcohol or any other intoxicating substance, the defendant's " 'mental or physical faculties are so impaired as to reduce [the] ability to think and act with ordinary care.' " *People v. Hires*, 396 Ill. App. 3d 315, 318 (2009) (quoting Illinois Pattern Jury Instructions, Criminal, No. 23.29 (4th ed. 2000)). To be under the influence of alcohol, a defendant must be under the influence to a degree that renders her incapable of driving safely. *People v. Phillips*, 2015 IL App (1st) 131147, ¶ 18. Whether a defendant was intoxicated is a question of fact to be resolved by the trial court. *Hires*, 396 Ill. App. 3d at 318.

¶ 58    To establish intoxication, the State is not required to present scientific proof, such as a breath or blood alcohol test; it may rely solely on circumstantial evidence, such as the credible testimony of the arresting officer. *People v. Tatera*, 2018 IL App (2d) 160207, ¶ 25; *People v. Morris*, 2014 IL App (1st) 130512, ¶ 20. The trier of fact may consider the officer's observations, such as the defendant's conduct, speech, or appearance; the odor of alcohol on the defendant's breath; and testimony that the defendant failed a field sobriety test. *Morris*, 2014 IL App (1st) 130512, ¶ 20; *People v. Robinson*, 368 Ill. App. 3d 963, 983 (2006). Any evidence of

alcohol consumption is relevant to the issue of impairment. *People v. McKown*, 236 Ill. 2d 278, 302 (2010).

¶ 59    After viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found defendant was impaired. Hourigan testified that after stopping defendant's car and addressing her, she responded in a slurred manner, saying she was "looking for my insurances [*sic*]." Defendant's eyes were "glassy and red" and Hourigan detected alcohol on her breath and from the vehicle. Defendant gave him two different names and reported a date of birth that differed from that on the state identification card bearing defendant's name that was recovered from the vehicle. Hourigan testified that defendant was under the influence of alcohol based upon the events that preceded the traffic stop, defendant's slurred speech, the odor of alcohol on her breath, the glassy and red appearance of her eyes, and her responses to his questions. Hourigan's testimony is sufficient to support defendant's conviction. Moreover, an open bottle of alcohol was recovered from the vehicle. Defendant refused to take a breath test at the police station, which is admissible evidence in a DUI prosecution (625 ILCS 5/11-501.2(c)(1) (West 2016)) and is circumstantial evidence of consciousness of guilt. *People v. Garriott*, 253 Ill. App. 3d 1048, 1052 (1993) (a driver's refusal is probative to the issue of intoxication).

¶ 60    Defendant argues that Hourigan did not administer any of the three field sobriety tests in compliance with recognized standards. She contends that the officer's testimony regarding his explanation and administration of the tests is contradicted by the video recording and that her performance of the tests did not establish her impairment. The trial court heard Hourigan's testimony and subsequently viewed the video recording. Although the failure of a field sobriety

test can be one factor indicating impairment, a finding of impairment can rest on solely on the officer's testimony. See *Tatera*, 2018 IL App (2d) 160207, ¶ 25; *Morris*, 2014 IL App (1st) 130512, ¶ 20. Therefore, even if this court does not consider the results of the field sobriety tests, the remaining evidence is sufficient to support defendant's conviction.

¶ 61    Defendant's remaining contention is that the trial court, in its oral ruling, impermissibly shifted the burden of proof to the defense. She contends the court concluded that the defense failed to present evidence of her innocence and that the court based her conviction on the weakness of the defense case, rather than on the strength of the State's evidence.

¶ 62    The State is required to bear the burden of proving all elements of a charged offense beyond a reasonable doubt. *People v. Howery*, 178 Ill. 2d 1, 32 (1997). The burden of proof remains on the State throughout the entire trial and at no time shifts to the defendant. *Id.* A defendant is not required to testify or present evidence and is presumed innocent throughout the course of the trial. *People v. Cameron*, 2012 IL App (3d) 110020, ¶ 27. The trial court is presumed to know the law, including the allocation of the burden of proof, and to apply it properly, absent a strong affirmative showing to the contrary in the record. *Howery*, 178 Ill. 2d at 32-33. Moreover, the court may comment on the implausibility of the theory or theories presented by the defense, as long as the record is clear that the court applied the proper burden of proof in finding the defendant guilty. *Id.* at 34-35. In addition, in a bench trial, as occurred here, the trial court serves as the trier of fact and may accept or reject inferences based on the evidence. *Id.* at 32-33.

¶ 63    Defendant relies on the following italicized remarks by the trial court to argue that the court did not allocate the burden of proof correctly. After addressing the State's evidence and

finding Hourigan's testimony credible and corroborated by the video, the court discussed the defense case as follows:

"The defense presented evidence on behalf of the defendant. The evidence that they presented consisted of three witnesses. [ ] The combined testimony of those individuals *did not in any way convince this court that the defendant in this case was not impaired* while driving *or that the defendant did not commit the traffic violations observed by the officer in this case.* Their credibility is weighed and viewed by the court individually and collectively when being considered.

A few examples of the lack of credibility exhibited by those witnesses, one or more than one of the witnesses testified that Bob, one of the witnesses never drinks; one of the witnesses said about Bob who did testify at the trial, Bob didn't drink that night.

Bob then testified—I believe he said he had at least three beers. So that calls into question the credibility of those witnesses in terms of what they observed, what they didn't observe, or what they wanted the court to know or what they didn't want the court to know.

But at the end of the day, the credibility does not weigh on whether the defendant is or isn't guilty of the offenses. It weighs on the ability of the court to take into consideration the testimony of those witnesses who wanted me as the trier of fact in this case to conclude that the defendant had not committed any traffic violations, the defendant was not impaired while she was driving and to the best of their knowledge, the defendant had nothing to drink that evening." (Emphasis added.)

¶ 64    The court noted that each defense witness testified he or she was not with defendant the entire time they were at the bowling alley. After further remarking on the credibility of various testimony, the court concluded:

> "So taking all that into consideration, given all weight necessary to the testimony of the defense witnesses, to the State witness, to the exhibits introduced into evidence, I believe that the defendant has been found guilty of the offense of aggravated DUI ***."

¶ 65    The court stated at the end of the hearing that it "believe[d] the State has proven the case beyond a reasonable doubt."

¶ 66    Considering the trial court's remarks in context, there is no affirmative showing that the court shifted the burden of proof to defendant. Rather, the record shows that after the court discussed the State's evidence, the court turned to the defense case and found the accounts of the defense witnesses incredible. The court noted that, as the trier of fact, it was required to consider the plausibility of their accounts in determining the weight to give their testimony. *People v. Heiman*, 286 Ill. App. 3d 102, 112 (1996) (the trial court may comment on the credibility of the witnesses at the close of evidence).

¶ 67    The court's italicized remarks reflect its conclusion that the defense's case did not weaken or rebut the evidence presented by the State. In summarizing its ruling, the court stated it had considered the testimony of all witnesses and the exhibits presented in finding defendant guilty of aggravated DUI. For those reasons, the trial court did not apply an incorrect standard of proof or place the burden of proof on the defense. See, *e.g.*, *Howery*, 178 Ill. 2d at 33-34 (given the court's remarks in their entirety, its remark that "there is no evidence of any kind of support a verdict of not guilty" did not shift the burden of proof to the defendant); *People v. Schuit*, 2016

IL App (1st) 150312, ¶¶ 113-14 (trial court's remark that it "found it significant" that defense experts failed to rule out a nonaccidental injury to baby did not constitute strong affirmative evidence that the court allocated burden of proof to defense).

¶ 68                                    III. CONCLUSION

¶ 69    In summary, the trial court's viewing of the video recording in chambers during a break in the trial did not implicate defendant's right to a public trial. Furthermore, the officer's observations of defendant were sufficient to support a finding of impairment, and the court did not shift the burden of proof to the defense in its remarks at the close of trial.

¶ 70    Accordingly, the judgment of the trial court is affirmed.

¶ 71    Affirmed.