2025 IL App (1st) 232304-U

No. 1-23-2304

Order filed September 30, 2025

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 10449 |
| | ) | |
| KELLY L. JAMES, | ) | Honorable |
| | ) | Sophia Atcherson, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE OCASIO delivered the judgment of the court.
Presiding Justice Navarro and Justice Quish concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction for aggravated driving under the influence of alcohol over her contentions that a video was improperly admitted and that the evidence was insufficient.

¶ 2    Following a bench trial, defendant Kelly L. James was found guilty of aggravated driving under the influence of alcohol (DUI), and sentenced to 10 days in jail and 24 months of felony probation. On appeal, James contends that the trial court abused its discretion when it admitted a video into evidence without a proper foundation. She further contends that she was not proven

guilty of aggravated DUI beyond a reasonable doubt when the State failed to establish that she could not think or act with reasonable care as a result of consuming alcohol or another "intoxicating compound," was offered and refused a breathalyzer test or blood draw, and was the proximate cause of the accident. We affirm.

¶ 3    James was charged with three counts of aggravated DUI following a July 8, 2019, vehicle accident. Relevant here, count I for aggravated DUI alleged that James drove or was in actual physical control of a motor vehicle while under the influence of alcohol, and in committing such a violation, was involved in a motor vehicle accident which caused great bodily harm to David Lopez, when the violation proximately caused his injuries. 625 ILCS 5/11-501(a)(2), (d)(1)(C) (West 2018). The State nol-prossed counts II and III.

¶ 4    At trial, Davis Harris testified that, around 3:30 a.m. on July 8, 2019, he was at a red light at the intersection of North Avenue and Ashland Avenue in Chicago. When the light turned green, he delayed entering the intersection as he heard a noise "like" an engine revving at a "really high rate of speed." He then observed a vehicle cross the intersection, striking a black SUV in the intersection and several parked vehicles. Harris exited his vehicle and called 911. He observed two men help a woman, whom Harris identified as James in court, exit the driver's seat of "the vehicle that struck the other vehicle." James yelled to "leave her alone" and that she was "okay," and then sat on a curb.

¶ 5    Harris reviewed People's exhibit No. 2, a "surveillance video" of the accident. The State asked whether Harris viewed the video prior to testifying, and he answered yes. The State then asked whether the "surveillance video" truly and accurately reflected the "crash." Defense counsel

objected "as to the reference that it's a surveillance video *** and *** if *** this is not a Chicago police video then we need foundation."

¶ 6    The trial court sustained the objection as to the characterization of the exhibit as a "surveillance video." As to foundation, the court allowed questions with "respect to the video" and what Harris believed "it to be."

¶ 7    The State asked Harris whether the video truly and accurately depicted the accident, and he answered yes. He further testified that he observed his own vehicle in the video. The State then asked to admit and publish the video.

¶ 8    Defense counsel again objected to the video's foundation, arguing it was unknown who took the video, when it was taken, and its accuracy. The court admitted the video over counsel's objection, noting that Harris testified that he reviewed the video and believed that it accurately depicted the accident and identified his vehicle. Defense counsel objected to the video's publication on the same grounds, which the trial court overruled.

¶ 9    The State then published the video and Harris identified his vehicle in a still image. This video is not contained in the record on appeal.

¶ 10    During cross-examination, Harris testified that he observed a vehicle cross the intersection "very fast" and strike a vehicle traveling eastbound. Harris did not know how the video was recorded but stated that the "images are definitely of *** that accident because that is my vehicle and *** it was something that was taped while the whole situation occurred." Counsel then asked, "So the video was shown in its entirety, you didn't see any auto accident here, did you?" Harris responded that he watched two videos and believed that one showed the accident. The court noted that the video "speaks for itself."

¶ 11    The State then published the video a second time, again over defense counsel's objection.

¶ 12    During redirect examination, Harris testified that James drove the SUV that ran a red light and struck a vehicle traveling eastbound on North.

¶ 13    Danny Franklin testified that, as he approached the intersection of North and Ashland in preparation to make a left turn onto Ashland, he saw a black SUV "speed[ ]" across the intersection. He heard, but did not see, the accident. He then stopped to help. The driver of the black SUV, whom he identified in court as James, refused help as she exited her vehicle. The State then published People's exhibit No. 2, and Franklin identified his vehicle on the footage.

¶ 14    David Lopez testified, through a Spanish interpreter, that around 3:30 a.m. on July 8, 2019, he was driving to work on North and remembered reaching the intersection of North and Ashland. He "woke up a month later" in a hospital, immobile and being fed through a tube. He went to a rehabilitation center where he learned to talk, eat, read, and write, and was released in August 2019. At the time of trial, he could not carry anything, needed assistance to bathe, and could not "walk a lot" without feeling like he would fall. He had not driven or worked since the accident. During cross-examination, Lopez acknowledged that he consumed one beer the afternoon prior to the accident.

¶ 15    Chicago police officer Brandon Perez testified that he received training in conducting DUI investigations and administering field sobriety tests. Perez described field sobriety tests as standardized tests that identify whether someone is under the influence of alcohol or drugs, and whether that person's motor skills are impaired. First, an officer observes the condition of the person's eyes, the smell of the person's breath, the person's mannerisms and way of speaking, and the person's attitude. Then, an officer administers the tests. During the horizontal gaze nystagmus

(HGN) test, an officer checks the involuntary rapid movement of a person's "pupils in their eyes." During the walk-and-turn test, a person performs nine heel-to-toe steps in a straight line, turns, and then does another nine heel-to-toe steps. Finally, during the one-legged stand test, a person stands with hands at the side of the body, raises one leg parallel to the ground, and counts.

¶ 16    When Perez approached James, she was seated on a curb at the scene of a multi-vehicle accident. She "seemed to be in distress naturally" as she was involved in an accident. After a brief interaction, during which James was "pretty distraught" and used a bystander's phone, Perez asked her to perform the field sobriety tests and she agreed. The tests were administered on a flat, dry sidewalk with artificial light.

¶ 17    First, Perez administered the HGN test, which tested consumption. He explained the test and asked James whether she had any issues with her eyes. Her response did not make him concerned. In performing the test, James had nystagmus at the "maximum deviation" in both eyes. Perez then explained and administered the walk-and-turn test and the one-legged stand test, which tested impairment. James was unable to keep her balance as Perez explained the walk-and-turn test, and, during the test, she was unable to place her heel to her toe, and lost balance while walking and turning. During the one-legged stand test, James lowered her foot.

¶ 18    Perez regularly observed people under the influence of alcohol and had made several DUI arrests. Perez smelled alcohol on James's breath and noticed that she was slurring her words. He acknowledged characterizing the smell of alcohol as "slight" in a police report. Following the field sobriety tests, Perez asked James whether she had anything to drink. James related that she had two "Monacos." Perez explained that a Monaco is a premade alcoholic beverage in a can. Perez

believed that James was under the influence of alcohol, arrested her, and placed her in a squad car. Perez later learned that James urinated inside the squad car.

¶ 19    Perez testified that he reviewed another officer's body camera footage prior to testifying. He observed himself on the video and stated that the footage truly and accurately depicted the events of July 8, 2019. The State then sought to admit the footage as People's exhibit No. 3.

¶ 20    Defense counsel objected, arguing that the officer who wore the camera should lay a foundation for the footage. The State responded that it sought to admit the portion of the footage where Perez was present for "everything" and could state that the footage truly and accurately depicted what he "saw happen."

¶ 21    The trial court overruled the objection as Perez reviewed the footage and indicated that it truly and accurately depicted the events. The State then sought leave to publish the footage. Defense counsel objected as to whether a proper foundation was laid as to the field sobriety tests and whether the walk-and-turn and one-legged stand tests were performed as to "NHTSA standards."

¶ 22    The court stated that it had heard, without objection, testimony about the administration of the field sobriety tests and Perez's opinion on those tests. Therefore, the footage would be published subject to cross-examination as to whether the tests were properly performed.

¶ 23    The footage, which was published, is not included in the record on appeal.

¶ 24    During cross-examination, Perez acknowledged that, in July 2019, he had been a police officer for approximately two years and had made several DUI or alcohol-related arrests. At the police academy, Perez learned "NHTSA" protocol and received a certificate to perform the HGN test.

¶ 25    After James was identified as driving the "offending vehicle," Perez approached her. He did not remember whether he asked James, while she was on the curb, whether she had consumed alcohol. However, given James's performance on the field sobriety tests, Perez wanted to see whether she would admit to consuming alcohol. Perez was "up in" James's face, but not "extremely close," and could detect the smell of alcohol when he spoke to James on the curb and during the tests.

¶ 26    Perez did not remember whether he checked James's eyes for equal tracking prior to the HGN test. However, he questioned James to determine whether she had an "ailment" that would prevent her from performing the HGN test. He acknowledged that James stated, in the video, that she had blurred vision in one eye. When Perez asked whether she wore glasses, she stated that she did but did not "have to." Perez was unsure whether the facts that James wore glasses and had blurred vision affected the HGN test. He acknowledged a person taking the HGN test should not move the head and that the video showed James moving her head frequently.

¶ 27    Perez told James to follow the stimulus with her eyes rather than her head. Although James stated that she understood the directions, Perez noted there was a difference between stating that one understood directions and actually understanding them. Perez "marked" James's failure to stop moving her head as "inability to follow instruction" and continued the test. Perez acknowledged that NHTSA standards require that the stimulus be 12 to 15 inches from the eye, slightly above eye level, and that a total of 14 passes occur. Perez did not measure the distance of the stimulus and did not recall the exact number of passes.

¶ 28    Perez acknowledged that he "perce[ived]" James's speech as slurred, but did not know whether her speech was slurred on other occasions. Perez saw James on the curb "distraught" and

not as "calm" as she would be without having been in an accident. James moved "perfectly fine" while walking and "nothing" indicated serious pain or an injury that would prevent her from performing the field sobriety tests.

¶ 29    A doctor who treated Lopez at a hospital testified that Lopez was placed on a ventilator and his injuries included a three-centimeter cut to the head, rib fractures, and a "completely deformed" left arm. CT scans revealed "acute extensive subarachnoid hemorrhage" and a spleen laceration, and x-rays revealed rib fractures, a partial lung collapse, and that the left scapula was "pretty much shattered." Tests showed benzodiazepine and fentanyl in Lopez's system, but those drugs had been administered during his hospital treatment. Lopez's "urine tox" was negative for alcohol. During cross-examination, the doctor clarified that the test showed less than 10 milligrams of alcohol in Lopez's system. During redirect, the doctor described that level of alcohol as "clinically insufficient."

¶ 30    The defense moved for a directed finding, arguing that the field sobriety tests were not performed properly and, although James was in "substantial distress" following the accident, Perez "insisted" on performing the HGN test. The State responded that the evidence established that James "disobeyed" a red light and hit Lopez's vehicle, causing Lopez's injuries, and that Perez opined that James was under the influence of alcohol. The court denied the motion.

¶ 31    In closing argument, defense counsel argued, relevant here, that the video of the accident was improperly admitted. Counsel then argued that Perez had described James as being "pretty distraught" and that it was unreasonable to ask someone involved in a "traumatic collision" to walk a straight line or stand on one leg. Counsel asked the trial court to consider the "very, very traumatic and serious accident" when reviewing the body camera footage and whether James's

performance on the field sobriety tests was due to the accident. Counsel further noted that neither a breathalyzer test nor blood draw were performed.

¶ 32 In finding James guilty of aggravated DUI, the court found that James was identified as the driver of the vehicle that sped through the intersection, that Perez smelled alcohol when James spoke, and the field sobriety tests showed "consumption and impairment." The court further noted that it reviewed the body camera footage depicting the field sobriety tests and that James did not walk heel to toe, did not take the proper number of steps, and "failed to keep her head still during the HGN test." Also, James admitted to drinking two alcoholic beverages. There was "no question" that James caused the accident after she went through a red light at a high rate of speed. Moreover, based on Perez's observations, *i.e.*, the smell of alcohol and the field sobriety tests, as well as James's admission that she consumed alcohol, James was under the influence during the accident and her "alcohol intoxication" was the "major cause" for the accident which caused Lopez's injuries.

¶ 33 James filed a motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial alleging, as relevant here, that the video of the accident was admitted without the proper foundation and that she was not proven guilty of aggravated DUI beyond a reasonable doubt.

¶ 34 Following argument, the trial court denied the motion and sentenced James to 10 days in jail and 24 months of felony probation. James filed a motion to modify sentence, which the court denied.

¶ 35 On appeal, James first contends that the trial court erred by admitting the "surveillance video."

¶ 36    Before addressing the merits of James's claim, we note that this video is not contained in the record on appeal. Our records reveal that one exhibit, consisting of one disk, was checked out by James's counsel on May 23, 2024. That disk has not been returned to this court. On June 12, 2025, James's counsel tendered to this court a disk that did not contain any files labeled as trial exhibits. On July 21, 2025, James's counsel moved to supplement the record with People's Exhibits #1, #2, and #3, which we allowed on July 22, 2025. However, none of those "exhibits" are the trial exhibits, let alone the "surveillance video" at issue. That said, the record before us includes the trial transcript, which contains the parties' arguments regarding the video's foundation and the trial court's reasoning in admitting the video, which allows us to review the trial court's decision to admit the video. To the extent that there are any doubts arising from the absence of the exhibit in the record, we will resolve them against James as the appellant. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984).

¶ 37    Our supreme court has held that "videotape may be admitted as demonstrative evidence when it is properly authenticated and is relevant to a particular issue in the case." *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 283 (2003). Accordingly, "a foundation must be laid, by someone having personal knowledge of the filmed object, that the film is an accurate portrayal of what it purports to show." *Id*. at 283-84. This foundation "may be furnished by the testimony of any competent witness who has sufficient knowledge to testify that the videotape fully represents what it purports to portray." (Internal quotation marks omitted). *Id*. at 284. We review the trial court's decision to admit a video into evidence for an abuse of discretion. *Id*.

¶ 38    James relies on *People v. Taylor*, 2011 IL 110067, to assert that the State failed to provide an adequate foundation for the video.

¶ 39 In *Taylor*, our supreme court explained that, although photographic evidence was historically used as demonstrative evidence, photographs and video can be used as substantive evidence with a proper foundation. *Taylor*, 2011 IL 110067, ¶ 32. In those cases, such evidence is usually admitted pursuant to the " 'silent witness' " theory, *i.e.*, "a witness need not testify to the accuracy of the image depicted in the photographic or videotape evidence if the accuracy of the process that produced the evidence is established with an adequate foundation." *Id*. Admission under the silent witness theory is a fact specific inquiry and "[t]he dispositive issue in every case is the accuracy and reliability of the process that produced the recording." *Id*. ¶ 35.

¶ 40 The silent witness theory, however, is necessary only when no witness testifies to the accuracy of the video. See *id*. ¶ 32. In other words, the silent witness theory does not preclude that "[a] proper foundation may be laid 'by someone having personal knowledge of the filmed object' " who can testify that the footage accurately portrays " 'what it purports to show.' " See *In re D.Q.*, 2016 IL App (1st) 160680, ¶ 25 (quoting *Cryns*, 203 Ill. 2d at 283-84).

¶ 41 At trial, Harris and Franklin identified their vehicles on the video. Moreover, Harris testified that he reviewed the video prior to trial, personally observed the depicted events, and that the video accurately depicted what he observed. See *Cryns*, 203 Ill. 2d at 284-85 (a witness who observed an event could establish a proper evidentiary foundation for a video of that event if he testified that the video accurately portrayed the event, and the video admitted into evidence was the same video he viewed).

¶ 42 Thus, Harris's and Franklin's firsthand knowledge of the events depicted on the video rendered a foundation pursuant to the silent witness theory unnecessary. See, *e.g.*, *People v. Vaden*, 336 Ill. App. 3d 893, 899 (2003) (video's foundation was properly laid when a police officer

testified that he observed the defendant approach a vehicle, lean inside, converse, and walk away, that these events were depicted in footage, and that the footage accurately portrayed what the officer observed). Accordingly, as Harris and Franklin identified their vehicles on the footage and Harris testified that the video accurately depicted what he observed, the trial court did not abuse its discretion in admitting it. See *Cryns*, 203 Ill. 2d at 283-85.

¶ 43     James next contends that she was not proven guilty of aggravated DUI beyond a reasonable doubt when the State failed to establish that she could "neither think nor act" with reasonable care as a result of consuming alcohol. She challenges Perez's testimony and administration of the HGN test, offers an alternative explanation for her performance on the field sobriety tests, and posits that Lopez's intoxication proximately caused the accident. James further argues that, because no evidence showed that she was offered and refused a breathalyzer test or blood draw, she did not exhibit a consciousness of guilt.

¶ 44     When reviewing a challenge to the sufficiency of the evidence, the reviewing court considers whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Jones*, 2023 IL 127810, ¶ 28. This court will not substitute its judgment for that of a fact finder regarding the weight of the evidence or the credibility of witnesses, and will not retry a defendant. *Id*. We reverse a defendant's conviction only when the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt. *Id.*

¶ 45     In order to sustain a conviction for aggravated DUI as charged, the State had to establish, beyond a reasonable doubt, that James drove or was in actual physical control of a motor vehicle while under the influence of alcohol, and in committing such a violation, was involved in a motor

vehicle accident which caused great bodily harm to Lopez, when the violation proximately caused his injuries. 625 ILCS 5/11-501(a)(2), (d)(1)(C) (West 2018).

¶ 46    A person is "under the influence of alcohol" when her "mental or physical faculties are so impaired as to reduce [the] ability to think and act with ordinary care." (Internal quotation marks omitted.) *People v. Groebe*, 2019 IL App (1st) 180503, ¶ 57. In other words, she "must be under the influence to a degree that renders her incapable of driving safely." *Id*. Whether a defendant is intoxicated is a question of fact. *Id.*

¶ 47    Scientific evidence such as a breath or blood alcohol test is not required to establish intoxication. *Id*. ¶ 58. Rather, the trier of fact may rely solely on circumstantial evidence, such as the arresting officer's observations of the defendant's conduct, speech, appearance, odor of alcohol, and ability to perform field sobriety tests. *Id*. The testimony of a single credible police officer may sustain a DUI conviction. *People v. Phillips*, 2015 IL App (1st) 131147, ¶ 18.

¶ 48    Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found that James was impaired by alcohol. Perez testified that he smelled alcohol when speaking to James, her words were slurred, and she had difficulty following directions. Despite being told not to move her head during the HGN test, she moved her head. During the walk-and-turn test, James was unable to keep her balance or place her heel to her toe. During the one-legged stand test, James lowered her foot. Additionally, James admitted to consuming two alcoholic beverages. Based upon this interaction, and her performance on the field sobriety tests, including her failure to follow directions, Perez concluded that James was under the influence of alcohol. Perez also testified that James urinated inside the back seat after being placed in the squad car.

Perez's testimony was sufficient to establish James's intoxication. See *Groebe*, 2019 IL App (1st) 180503, ¶ 58.

¶ 49    Nonetheless, James relies on Perez's testimony that the alcohol odor from James was slight, and that she was distraught, to argue that any "impairment" could have been caused by the accident rather than by alcohol. However, it was for the trial court, as the trier of fact, to weigh and resolve conflicts in the evidence and draw reasonable inferences from that evidence. *People v. Williams*, 193 Ill. 2d 306, 338 (2000).

¶ 50    To the extent James contends that she could not be found guilty based upon consciousness of guilt because she was not offered, and did not refuse, a breathalyzer test and blood test, the trial court stated that it relied upon Perez's testimony and the body camera footage detailing the field sobriety tests. This court does not have the benefit of that footage, as the exhibit is not contained in the record on appeal. Any doubts arising from the incompleteness of the record will be construed against the appellant, in this case, James. *Foutch*, 99 Ill. 2d at 391-92; *People v. Castejon*, 2025 IL App (1st) 221918, ¶ 39. Moreover, the fact that James was not offered a breathalyzer test or a blood test was not fatal to the State's case. See *People v. Diaz*, 377 Ill. App. 3d 339, 344-45 (2007) ("The State need not present chemical evidence of intoxication in the form of a Breathalyzer or blood test to obtain a [DUI] conviction; rather, the credible testimony of an arresting officer may be sufficient to prove the offense.").

¶ 51    James further argues that Perez did not administer the HGN test in accordance with recognized standards. At trial, counsel extensively cross-examined Perez as to the HGN test standards and the manner in which he administered the test to James. Perez was unsure whether the facts that James wore glasses and had blurred vision affected the HGN test's accuracy,

acknowledged that James moved her head during the test despite being told to stay still, and did not recall the distance of the stimulus and the number of passes. Although James asserted that Perez's improper administration of the HGN test affected its reliability and results, "a fact finder need not accept the defendant's version of events as among competing versions." *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001). Even were this court to agree with James's assertion that the HGN test was improperly administered, Perez's testimony, which included his observations of James and her results on the two other field sobriety tests, was sufficient to support the trial court's guilty finding. See *Groebe*, 2019 IL App (1st) 180503, ¶ 60 (while "failure of a field sobriety test can be one factor indicating impairment, a finding of impairment can rest *** solely on the officer's testimony").

¶ 52    James finally asserts that Lopez's intoxication proximately caused the accident. In other words, she argues that the State failed to establish that her impaired driving was the proximate cause of the accident.

¶ 53    In order to sustain a conviction for aggravated DUI as charged, the State had to establish that James's underlying DUI offense—her impaired driving—proximately caused Lopez's injuries. "Proximate cause includes both cause in fact and legal cause." *People v. Johnson*, 392 Ill. App. 3d 127, 131 (2009). "Cause in fact exists where there is a reasonable certainty that a defendant's acts caused the injury or damage." (Internal quotation marks omitted.) *Id.* Legal cause is established when " 'an injury was foreseeable as the type of harm that a reasonable person would expect to see as a likely result of his or her conduct.' " *Id*. (quoting *Hooper v. County of Cook*, 366 Ill. App. 3d 1, 7 (2006)).

¶ 54    While the doctor first testified that Lopez's "urine tox" was negative for alcohol, he then testified that it showed less than 10 milligrams of alcohol in Lopez's system and characterized that level as "clinically insignificant." The State presented further evidence establishing that James drove the vehicle that struck Lopez's vehicle, that she smelled of alcohol, slurred her words when speaking, admitted to drinking two alcoholic beverages, and performed poorly on field sobriety tests. This evidence supports the conclusion that James was impaired when the vehicle she was driving struck Lopez's vehicle. A trier of fact need not disregard inferences which flow normally from the evidence or seek out all possible explanations consistent with innocence and raise them to the level of reasonable doubt. *In re Jonathan C.B.*, 2011 IL 107750, ¶ 60.

¶ 55    We further note that, pursuant to the statute, a person's violation of section 11-501(a) of the Illinois Vehicle Code must be "*a* proximate cause of [the victim's] injuries" (Emphasis added.) 625 ILCS 5/11-501(a)(2), (d)(1)(C) (West 2020). It need not be " 'the sole and immediate cause.' " *Johnson*, 392 Ill. App. 3d at 130 (quoting *People v. Merritt*, 343 Ill. App. 3d 442, 448 (2003)). Thus, even if there were multiple proximate causes for Lopez's injuries, James is not excused if her impaired driving was one of them. "Comparative negligence is not a defense in a criminal case." See *People v Olvera*, 2023 IL App (1st) 210875, ¶ 53.

¶ 56    Accordingly, there was sufficient evidence from which a trier of fact could find that James, who was impaired by alcohol, operated her vehicle in such a manner that it struck Lopez's vehicle, and that this accident proximately caused Lopez's injuries. We reverse a conviction when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt as to a defendant's guilt. See *Jones*, 2023 IL 127810, ¶ 28. This is not one of those cases. Accordingly, we affirm James's conviction for aggravated DUI.

¶ 57    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 58    Affirmed.